## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JALAK JOBANPUTRA, an individual<br><br>                 Plaintiff,<br><br>    v.<br><br>YOON KIM, an individual, and MOCHI<br>CAPITAL, LLC, a limited liability company,<br><br>              Defendants. | Civ. Action No. 1:21-cv-7071<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jalak Jobanputra ("Jalak" or "plaintiff"), through her undersigned counsel of record, brings this Complaint against defendants Yoon Kim ("Kim") and Mochi Capital, LLC ("Mochi") (collectively, "defendants") to secure damages/restitution and demanding trial by jury, claims and alleges as follows:

## INTRODUCTION

1. This civil action is brought by entrepreneur and venture capitalist Jalak Jobanputra to enforce her rights under an agreement she and defendants entered into, and which defendants have breached, causing damages in excess of $3.4 million.

2. Jalak, an investment trailblazer in the financial technology ("fintech") markets, has built a well-earned reputation of being a "Top 100 Most Influential Fintech Leader" and a "Top 5 Investor Powering the Blockchain Boom." Her business and investment credentials are matched only by her philanthropic and public service efforts, which have spanned for over two decades and range from training women entrepreneurs in Tanzania to serving on various education boards and government taskforces. Because of her enviable credentials, Jalak is highly sought after as a consultant, advisor, and business partner.

3. Defendant Kim was introduced to Jalak through friends on or about 2005 to 2006, whereafter the two maintained a cordial friendship. Years later, Kim, whose experience in fintech markets is far less than that of Jalak, leveraged that relationship to discuss a joint business arrangement centered around cryptocurrency investments.

4. On or around August 2017, Jalak and Kim entered into a joint business venture that would pool their respective expertise and resources to create opportunities for profit in cryptocurrency investments. Jalak only considered this joint business venture because the venture capital funds that Jalak managed at the time did not permit investments into

2

cryptocurrency assets, a fact which Kim knew because he was an investor in Jalak's venture capital funds.

5. Per the terms of the agreement, Jalak would contribute her experience, credentials, and business network, including her proprietary investment analysis, to identify viable cryptocurrency investments, and Kim would provide liquid capital for the investments, with all profits subject to a 20/80 split, including the profits derived from eventual sale of the cryptocurrencies and any profits realized from use of the cryptocurrency tokens on their respective networks, such as staking rewards. Because Kim would be transferring the capital for the investments, the assets from each investment would be distributed once the tokens became transferable pursuant to the terms of each token sale ("Token Sale") such that both Jalak and Kim could realize their profits.

6. Through this agreement, the joint venture was able to initially invest in two Token Sales, with an initial total investment of $175,000, before the COVID-19 pandemic hit the markets; all tokens obtained by the joint venture are now transferable and saleable. However, in breach of the agreement, defendants Kim and Mochi (Kim's limited liability company) have reneged on the arrangement and refused to transfer Jalak her rightful entitlement to 20% of the respective cryptocurrency investments. In fact, defendants have failed to reply to Jalak's emails, return her phone calls, and completely ignored Jalak and the agreement. For context, the $175,000 in investments made by the joint venture is trading at a present-day value of more than $17.1 million.

7. Jalak comes now seeking damages for breach of contract, breach of fiduciary duty, and in the alternative, restitution for unjust enrichment and quantum meruit.

## PARTIES

8.     Plaintiff Jalak Jobanputra is an individual domiciled in Miami, Florida, USA.  At all relevant times herein, Jalak was a resident of New York, New York, USA.

9.     Defendant Yoon Kim is an individual domiciled in New York, New York, USA and, at all times relevant, was and is a citizen and resident of New York, New York, USA.

10.     Defendant Mochi Capital, LLC is a limited liability company organized under the laws of the state of Delaware, who, on information and belief, has its principal place of business in New York.  Upon further information and belief, Mochi Capital LLC's member(s) are all citizens of states other than Florida.

11.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times mentioned herein, Mochi Capital, LLC was, and is, the alter-ego of Defendant Yoon Kim, and that there exists, and at all times herein mentioned has existed, a unity of interest and ownership between them such that any separateness between them has ceased to exist in that Kim has completely controlled, dominated, managed, and operated Mochi to suit his convenience.

12.     On information and belief, at all times relevant hereto, Defendant Kim (1) controlled the business and affairs of Mochi; (2) commingled the funds and assets of the corporate entity and diverted corporate funds and assets for his own personal use; (3) inadequately capitalized Mochi; (4) used Mochi as a mere shell, instrumentality or conduit for himself or his individual businesses; (5) used Mochi to conceal his ownership, management and financial interests and/or personal business activities; and/or (6) used Mochi to shield against personal obligations, and in particular the obligations as alleged in this Complaint.  Plaintiff maintains that Kim is personally liable for all acts taken under the purported auspices of Mochi,

and that Kim and Mochi should be considered alter-egos because adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the parties and this action based on principles of diversity under 28 U.S.C. § 1332(a)(1) because diversity of citizenship currently exists between the parties and the amount in controversy exceeds $75,000.  Jalak is a citizen of the State of Florida, Kim is a citizen of the State of New York, and Mochi, by and through its members, is a citizen of the State of New York and/or States other than Florida.

14.     This Court has personal jurisdiction over Kim as Kim is domiciled in New York. The Court also has specific personal jurisdiction over Kim because Kim has purposely availed himself of New York's benefits and protections and conducts a substantial amount of business in New York, such that the Court's exercise of jurisdiction over Kim is reasonable and wholly consistent with traditional notions of fair play and substantial justice.  This Court has personal jurisdiction over Mochi because Mochi has its principal place of business in New York. Personal jurisdiction over Mochi also exists and is proper because Mochi has purposely availed itself of New York's benefits and protections and does a substantial amount of business in New York, such that the Court's exercise of jurisdiction over Mochi is reasonable and wholly consistent with traditional notions of fair play and substantial justice.  Personal jurisdiction over all defendants exists because the claims for relief set forth in the Complaint arise out of the transaction of business in New York and comports with the United States Constitution and the New York long-arm statute, N.Y. CPLR 302.

15.     Pursuant to 28 U.S.C. §§ 1391(b)-(c), venue is proper in the Southern District of New York because venue may be laid in any judicial district where all defendants reside.  Kim is a citizen and resident of this judicial district and, for purposes of venue, Mochi is considered to reside in this judicial district because this Court has personal jurisdiction over Mochi.  Venue is also proper in the Southern District of New York because a substantial part of events and/or omissions giving rise to the claims for relief in this complaint occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

16.     Jalak Jobanputra is a prominent businesswomen, entrepreneur, philanthropist, and venture capitalist who has worked in the investment world for more than 20 years.  Jalak graduated magna cum laude from the Wharton School at the University of Pennsylvania and received her MBA from the Kellogg School of Management at Northwestern University.  Jalak founded the venture capital fund Future\Perfect Ventures ("FPV") in 2014, which was one of the first venture capital funds to invest in blockchain technology.

17.     Jalak has also dedicated much of her life to community service, including establishing microfinancing projects for female entrepreneurs in Tanzania, consulting for Bill and Melinda Gates Foundation's grantees to increase the number of high-quality charter schools around the country, making affordable broadband Internet access a reality by serving on Mayor Bill DeBlasio's Broadband Taskforce, and founding Collective Future, an organization dedicated to promoting diversity and inclusion within the blockchain sector.

18.     FPV is an early-stage venture capital fund that invests in decentralized technology.  As FPV's founding partner, Jalak's investment acumen is renowned, particularly in

the arena of rapidly developing financial and blockchain technology, and her work is widely

recognized for helping to bring emerging technologies such as blockchain to the public sphere.

19.    For example, in 2011, Jalak was selected as a United States State Department

Delegate to Indonesia to promote technology entrepreneurship.  Between 2016 and 2018, Jalak

was recognized as Institutional Investor's Most Powerful Fintech Dealmakers.  In May 2018, she

was awarded Microsoft's Venture Capital Trailblazer Award for "her early and bold"

investments in the sector and she was also listed as a top 100 Most Influential Fintech Leader of

2016 and 2017 for her investment strategies at FPV.  In 2017, Jalak was recognized as a "Top 5

Investor Powering the Blockchain Boom."

20.    In sum, Jalak's experience and talent make her an ideal and highly valuable

partner for anyone looking to invest or otherwise participate in fintech markets.

21.    Defendant Kim currently works as the Head of Research at a digital asset fund,

and, on information and belief, did not have any exposure to investing in digital assets and/or

blockchain technology until after meeting Jalak.  Kim and Jalak met in approximately 2005 or

2006 through mutual acquaintances.

22.    Defendant Kim, who has far less experience than Jalak in the fintech market,

recognized this experience and talent, and leveraged his personal friendship with Jalak to

approach her regarding a potential business arrangement.

23.    On or about August 2017, Jalak and Kim negotiated and knowingly and willingly

entered into a joint business venture in this judicial district wherein the parties would pool their

respective expertise and resources to create opportunities for profit in cryptocurrency

investments (the "Agreement").  At the time, the venture capital funds Jalak managed as part of

7

FPV were not yet able to invest in cryptocurrency assets, a fact which Kim knew well as he was an investor in FPV's venture capital funds.

24.    The Agreement was that Jalak would contribute her experience, credentials, and business network, including her proprietary investment analysis, to identify viable cryptocurrency investments, and Kim would provide liquid capital for the investments on behalf of the partnership.  The profits would be split with Jalak receiving 20% of each investment, but her work would otherwise be unpaid.  As the primary funder of such endeavors, Kim was entitled to retain the other 80% of the investment.

25.    Some of the investments made by Jalak and Kim were into cryptocurrencies that were still in the process of technological development and were not yet transferable.  Thus, Jalak and Kim agreed that the profits, *i.e.*, cryptocurrency/proceeds/value from each joint venture transaction would be distributed once there was liquidity in the relevant cryptocurrency investment, that is, once the relevant cryptocurrency was transferrable.  Once the cryptocurrency was transferrable, both Jalak and Kim could have realized profits either from sale of the cryptocurrency assets or by utilizing those assets on their respective networks, such as by deriving staking rewards.

26.    Under the Agreement, Jalak had the option of converting her share of the cryptocurrency into capital contributions to share in potential investment losses (in addition to the losses suffered from her unpaid labor) in exchange for a higher "carry" or share of the total realized profits.   Further, each investment opportunity would need to be approved by both joint venturers.

27.    As part of the Agreement, Jalak identified an upcoming Token Sale by the Web 3 Foundation ("Web 3") for their Polkadot tokens ("DOTs").  Because of the exclusivity and

limited availability of certain Token Sales, particularly in the early technological development stage, the fintech investing community at large often does not have access to certain Token Sales, including Web 3's.  Jalak leveraged her considerable community capital and wealth of investment expertise so that she and Kim would be able to access the Token Sale.  Without Jalak, the joint venture would not have been able to access the DOTs Token Sale, at the same time and on the same favorable terms.

28.     In September 2017, Jalak secured an allocation of DOTs for the joint venture. Kim advised that his limited liability company, Mochi, would be an appropriate corporate vehicle to purchase the DOT allocation.  On or about and between September 25 and 27, Jalak sent emails to Kim and Web 3 that made clear that Jalak was the principal point of contact with Web 3 with the investment simply being made *through* Mochi Capital LLC.  Consistent with this, and in recognition that Jalak was required to be the principal point of contact with Web 3, as well as the joint nature of their venture, Kim appointed Jalak as a director of Mochi.

29.     On September 27, 2017, Jalak forwarded Kim the Simple Agreement for Tokens ("SAFT") from Web 3 for Kim to complete in order to secure the allocation of DOTs.  Kim, based out of New York, completed the SAFT on behalf of Mochi on September 29, 2017 and sent to Web 3 a $150,000.00 USD contribution from a New York bank account in this judicial district.  Kim also sent Web 3 a cryptocurrency wallet address controlled by Kim, where the partnership would receive the DOTs.  Web 3 countersigned the SAFT on October 11, 2017, and distributed 5,320.101 DOTs to Kim's crypto wallet on October 29, 2017.

30.     On the date Web 3 transferred the DOTs to Kim's cryptocurrency wallet, the DOTs were neither transferrable nor saleable and the Polkadot network on which the DOTs could be used was still under technological development.  Indeed, under the terms of the SAFT,

9

the DOTs that were transferred to Kim's designated crypto wallet were non-transferable until the "deployment of the Polkadot genesis block." Although there was no fixed date for deployment of the Polkadot genesis block, the SAFT provided that Web 3 would use its best efforts to deploy it within two years of the September 2017 SAFT, but it was possible that it would be deployed within one year.

31.    Similarly, on or about November 2017, Jalak and Kim's joint venture invested in Blockstack's Token Sale based on Jalak's fintech expertise and access. Kim provided $25,000 in capital and the joint venture received 208,333 STX, which is a cryptocurrency designed to operate on Blockstack's Stacks Network. As with DOTs, STX was non-transferable and non-saleable when it was initially transferred to Kim's cryptocurrency wallet because the Stacks Network had not yet been deployed, but it was possible that they would be deployed within one year.

32.    While Jalak and Kim waited for STX to become transferrable and saleable, Web 3 launched in a series of phases beginning in July 2019.

33.    Around the same time, Web 3 announced that all DOT token holders would be entitled to an equal amount of Kusama tokens ("KSM") for use on Polkadot's experimental, community-focused research and development network.[1] Thus, Kim and Jalak were collectively entitled to 5,320.101 KSM in addition to the DOTs. KSMs became fully transferable and saleable in December 2019. However, Kim has yet to transfer to Jalak her 20% of the 5,320.101 KSM, which would be 1,064 KSM. Because of Kim's failure to transfer the KSM, Jalak has

---

[1] See "Announcing the Kusama Network," Polkadot (July 15, 2019), *available at* *https://polkadot.network/kusama-network-thecanary-network/.*

missed out on the opportunity to sell the KSM at a profit or, alternatively, profit from staking KSM since December 2019.

34.     In late 2019 and early 2020, Kim and Jalak explored the idea of expanding their joint venture to include a cryptocurrency assets venture capital fund that would include other investors.  Because Jalak had the requisite experience and name recognition in the digital assets space, the venture capital fund was to be called "FP Capital," which was a nod to Jalak's company, FPV.  In preparing presentations for multiple potential investors, Jalak and Kim held themselves out to third parties as the joint venturers that they were, and, consistent with the Agreement, Kim clearly represented that he and Jalak had *jointly* invested in both DOTs and STX and that these investments were owned by both of them.  A true and correct copy of this investment presentation is attached hereto as Exhibit A.

35.     In private correspondence between Kim and Jalak, Kim also referred to the DOT and STX investments as being made jointly.  For example, on April 12, 2019, Jalak told Kim that he should include "the fact that we did Polka Dot + Blockstack together" in the investor presentation.  Kim responded the same day and stated that he "did mention both of them in the strategy overview as *our* ICO, *i.e.*, non-public investment examples but will create summary pages for the deck as well."[2]  A true and correct copy of this email exchange is attached hereto as Exhibit B.

36.     Ultimately, due to the COVID-19 pandemic, FP Capital never launched and the investments in DOTs, KSMs, and STX remained jointly those of Kim and Jalak.

---

[2] Kim's reference to an "ICO" or "initial coin offering" is, in fact, a reference to the Polkadot and Blockstack Token Sales described in this complaint.

37.     On or about August 18, 2020, DOTs became transferable. Around that same time, the Polkadot network changed the denomination of its DOT token such that the original 5,320.101 DOTs issued to Kim's crypto wallet were redenominated to 532,010.10 DOTs as of August 21, 2020.  Kim never transferred to Jalak her 20% of the DOTs, which given the redenomination, would amount to 106,402.02 DOTs.  Because of Kim's failure to transfer the DOTs, Jalak has missed out on the opportunity to sell the DOTs at a profit or, alternatively, profit from staking DOTs since August 2020.

38.     As Jalak is and always has been the primary point of contact for Web 3, Jalak made Kim aware both of the transferability of the DOTs and their redenomination by e-mail on August 18, 2020.  Jalak received no response to her e-mail.

39.     STX became transferable and saleable in the United States on or about January 2021.  Kim has never transferred to Jalak her 20% of the STX, which would be 41,667 STX. Because of Kim's failure to transfer the STX, Jalak has missed out on the opportunity to sell the STX at a profit or, alternatively, profit from staking STX since January 2021.

40.     Since August 18, 2020, Jalak has repeatedly e-mailed and called Kim demanding transfer of the 20% of the KSMs, DOTs, and STX to which she is entitled under the terms of the Agreement.  Kim has not answered her e-mails.  Additionally, after numerous phone calls in which Jalak attempted to reach Kim to discuss these matters, on or around November 2020, Jalak discovered that Kim's telephone number had apparently been disconnected.

41.     Kim's failure to transfer the DOTs, KSMs, and STX when those cryptocurrencies became transferable and saleable is a material breach of the Agreement.

42.     Given that cryptocurrency values fluctuate daily, if not hourly, the USD cash equivalent of Jalak's share of DOTs, KSMs, and STX since these cryptocurrencies became saleable and transferable could have been as high as the following:

    a.   DOTs (106,402.02):     $5,287,116.37 USD (high price of $49.69/DOT)

    b.   KSMs (1,064):         $663,670.00 USD (high price of $623.75/KSM)

    c.   STX (41,667):         $117,500.94 USD (high price of $2.82/STX)

43.     At current market prices, the USD cash equivalent of Jalak's share of DOTs, KSMs, and STX is as follows:

    a.   DOTs (106,402.02):     $3,004,793.04 USD (current price of $28.24/DOT)

    b.   KSMs (1,064):         $366,356.48 USD (current price of $344.32/KSM)

    c.   STX (41,667):         $59,583.81 USD (current price of $1.43/STX)

44.     In addition to profiting from the investment in DOTs and KSM, Jalak could have derived consistent revenue from the staking of these cryptocurrency assets at a reward rate of approximately 13 to 15% interest on the assets staked.  With STX, Jalak could have earned Bitcoin (BTC) in exchange for stacking her share of the STX.

45.     Kim has ignored Jalak's demands in breach of the Agreement.

## CLAIMS FOR RELIEF

46.     Jalak brings each of the following claims for relief against defendants:

### First Claim for Relief
### Breach of Contract / Joint Venture Agreement

47.     Jalak incorporates and re-alleges the preceding paragraphs of this Complaint as if fully set forth herein.

48.     Jalak and Kim knowingly and willingly entered into a contractual relationship as alleged herein that entitled Jalak to a 20% cryptocurrency share of each investment Jalak and

defendants made based on Jalak's contribution of her experience and credentials to identify, and gain access to, attractive cryptocurrency investments for the joint venture.

49.     Jalak provided valid consideration for the Agreement, and Jalak fully performed her obligations under the Agreement when she leveraged her considerable community capital and wealth of investment expertise so that the partnership could invest in DOTs, KSMs, and STX.  The partnership, through defendants Kim and Mochi, invested $150,000 in Web 3's Token Sale which resulted in the partnership being eligible for the receipt of 5,320.101 KSM and 532,010.10 DOTs.  The partnership also invested $25,000 in Blockstack's Token Sale which resulted in 208,333 STX being issued to the partnership.

50.     Kim and Mochi breached the Agreement by failing to provide Jalak with the 20% share of the investments to which she is entitled after the cryptocurrency became transferrable.

51.     As a result of the breaches of Kim and Mochi, Jalak has been damaged in the USD equivalent of 106,402.02 DOTs, 1,064 KSMs, and 41,667 STX.  Assuming Jalak sold these cryptocurrency tokens at the height of the market, she would have realized over $6 million in USD in addition to staking and stacking rewards.  Assuming present-day value, the DOTs, KSMS, and STX are worth over $3.4 million USD in addition to lost staking and stacking rewards.

**Second Claim for Relief**
**Unjust Enrichment**

52.     Jalak incorporates and re-alleges the preceding paragraphs of this Complaint as if fully set forth herein.

53.     Jalak, Kim, and Mochi entered into an arrangement as alleged herein in which Jalak would provide her extensive experience, knowledge, and skill to allow the group to invest in potentially profitable cryptocurrency opportunities.

14

54.     Jalak received no hourly wage, salary, or any other compensation for her extensive efforts and work.

55.     As a result of Jalak's contributions, Kim and Mochi made investments of $175,000 that are now worth many millions of dollars, and have potentially earned additional sums based on staking and stacking rewards, based wholly on Jalak's skill, contributions, and connections.  This situation has benefitted and unjustly enriched Kim and Mochi at Jalak's expense.

56.     It is against equity and good conscience to permit Kim and Mochi to retain the value of the services provided by Jalak, which are the value of the investments they would not have been able to make but for Jalak's work and contributions.

**Third Claim for Relief**
**Quantum Meruit**

57.     Jalak incorporates and re-alleges the preceding paragraphs of this Complaint as if fully set forth herein.

58.     Jalak performed the services described in this Complaint for Kim and Mochi in good faith.

59.     Kim and Mochi accepted these services provided by Jalak.

60.     Jalak reasonably expected to be compensated for her services in the form of 20% share of the cryptocurrency tokens issued based on any monetary investment made by Kim and Mochi.

61.     The reasonable value of Jalak's services, who is a prominent venture capitalist, fintech entrepreneur, and venture capital fund manager with exceptional credentials in digital assets is equivalent to 20% share of the digital assets that are the subject of this Complaint, or in excess of $3.4 million USD in addition to lost staking and stacking rewards.

15

**Fourth Claim for Relief**
**Breach of Fiduciary Duty**
**(Against Defendant Kim)**

62.     Jalak incorporates and re-alleges the preceding paragraphs of this Complaint as if fully set forth herein.

63.     Pursuant to the joint venture partnership entered into by Jalak and Kim as alleged herein, Kim owed fiduciary duties of care, loyalty, and good faith to Jalak.

64.     Kim breached his fiduciary duties owed to Jalak when, among other things, Kim failed to transfer 20% of the cryptocurrencies allocated to him by reason of the joint venture partnership's investments.

65.     As a direct and proximate cause of Kim's breach of his fiduciary duties, Jalak has suffered and will continue to suffer damages in an amount to be proven at trial, but which is no less than $3.4 million USD in addition to lost staking and stacking rewards.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Jalak Jobanputra prays that the Court adjudge and decree and enter judgment in its favor and against defendants as follows:

1.     That Jalak is entitled to contractual damages in an amount not less than $3,430,733.33, plus interest thereon.

2.     That Jalak is entitled to compensatory damages in an amount to be proven at trial, as permitted by law and according to proof, plus interest thereon;

3.     That Jalak is entitled to restitution in an amount to be proven at trial;

4.     That Jalak is entitled to costs of suit including attorneys' fees and costs; and

5.     That Jalak be afforded such other and further relief as the Court deems just and proper, including but not limited to specific performance of the Agreement.

16

## DEMAND FOR JURY TRIAL

Plaintiff Jalak Jobanputra hereby respectfully demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  August 20, 2021
        Los Angeles, CA

**WAYMAKER LLP**

By: _____
      Brian E. Klein
      Melissa A. Meister
      Jose R. Nuño
      777 S. Figueroa Street, Ste. 2850
      Los Angeles, CA 90017
      Telephone: (424) 652-7800
      Facsimile: (424) 652-7850
      bklein@waymakerlaw.com
      mmeister@waymakerlaw.com
      jnuno@waymakerlaw.com

      *Attorneys for Plaintiff*
      *Jalak Jobanputra*