UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

JALAK JOBANPUTRA, an individual,    :             1:21-cv-07071 (ER)

                Plaintiff     :
      v.
                        :

YOON KIM, an individual, and MOCHI
CAPITAL, LLC, a limited liability
company,

                        :
                Defendant.
------------------------------------------------------x


## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT


BRIAN E. KLEIN
TERESA L. HUGGINS
WAYMAKER LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
(424) 652-7800


*Attorneys for Jalak Jobanputra*

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  RELEVANT ALLEGATIONS.................................................................................3

   A.  Kim and Jalak Agree to Enter a Joint Venture ............................................3

   B.  The Joint Venture Invests in Token Sales and Becomes Profitable ............4

   C.  Kim Keeps the Profits for Himself, In Breach of the Joint Venture and His Fiduciary Duties to Jalak.................................................................................7

III. LEGAL STANDARD..............................................................................................8

IV.  ARGUMENT...........................................................................................................9

   A.  Plaintiff Has Alleged a Breach of Joint Venture .........................................9

      1.  The Parties Intended to Become Joint Venturers....................................10

      2.  Plaintiff Has Alleged the Parties' Intent to Share Profits and Losses....15

         a.  Jalak Alleges the Parties' Intent to Share Profits.................................15

         b.  Jalak Alleges the Parties Agreed to a Provision for Sharing Losses ...17

   B.  Plaintiff Has Sufficiently Alleged a Breach of Fiduciary Duty .................18

   C.  Plaintiff Alleges a Valid, Enforceable Contract .........................................20

   D.  Plaintiff Has Sufficiently Alleged Equitable Claims .................................22

   E.  Leave to Amend Is Favored Over Dismissal ..............................................24

V.   CONCLUSION......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abercrombie v. Andrew Coll.*,
438 F. Supp. 2d 243 (S.D.N.Y. 2006).......................................................2, 19, 21

*Ackerman v. Landes*,
493 N.Y.S.2d 59 (2d Dep't. 1985).......................................................17

*Anderson News, LLC v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012).......................................................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................9

*Astroworks, Inc. v. Astroexhibit, Inc.*,
257 F. Supp. 2d 609 (S.D.N.Y. 2003).......................................................23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................9

*Buffalo Forge Co. v. Ogden Corp.*,
555 F. Supp. 892 (W.D.N.Y. 1983).......................................................23

*Canet v. Gooch Ware Travelstead*,
917 F. Supp. 969 (E.D.N.Y. 1996).......................................................2, 10, 12, 18

*CBS Broadcasting Inc. v. Jones*,
460 F. Supp. 2d 500 (S.D.N.Y. 2006).......................................................23

*Cosy Goose Hellas v. Cosy Goose USA, Ltd.*,
581 F. Supp. 2d 606 (S.D.N.Y. 2008).......................................................19

*Decker, Decker & Assocs., Inc. v. Assoc. of Nat. Advertisers, Inc.*,
839 N.Y.S.2d 432 (Sup. Ct. 2007).......................................................18

*Fisher v. Tice*,
No. 15cv955 (LAK) (DF), 2016 WL 4626205 (S.D.N.Y. July 5, 2016).......................................................10, 19

*Foman v. Davis*,
371 U.S. 178 (1962).......................................................9, 25

*Foundation Ventures, LLC v. F2G, LTD.*,
No. 08 Civ. 10066 (PKL), 2010 WL 3187294 (S.D.N.Y. Aug. 11, 2020).......................................................22, 24

*Gibbs v. Breed, Abbott & Morgan*,
710 N.Y.S.2d 578 (1st Dep't 2000).......................................................19

*Glenmark, Inc. v. Carity*,
    221 N.Y.S.2d 330 (Sup. Ct. N.Y. Cty. 1961) ....................................................16

*Griffith Energy, Inc. v. Evans*,
    85 A.D.3d 1564 (4th Dep't 2011) .................................................................12

*Growblox Sciences, Inc. v. GCM Administrative Services, LLC*,
    14 Civ. 2280 (ER), 2016 WL 1275050 (S.D.N.Y. Mar. 31, 2016)......................17

*In re PCH Assocs.*,
    55 B.R. 273 (S.D.N.Y. 1985).........................................................................18

*Katz v. Zuckermann*,
    481 N.Y.S.2d 271 (Sup. Ct. Queens Cty. 1984) ...................................1, 3, 24, 25

*Keiler v. Harlequin Enters. Ltd.*,
    751 F.3d 64 (2d Cir. 2014).............................................................................9

*Kidz Cloz, Inc. v. Officially for Kids, Inc.*,
    320 F. Supp. 2d 164 (S.D.N.Y. 2004).............................................................2

*Lightbox Ventures, LLC v. 3RD Home Limited*,
    No. 16cv2379 (DLC), 2016 WL 6562107 (S.D.N.Y. Oct. 28, 2016).................18

*Mandelblatt v. Devon Stores, Inc.*,
    521 N.Y.S. 2d 672 (App. Div. 1987) ..............................................................20

*Mitsubishi Elec. Corp. v. Westcode, Inc.*,
    No. 3:15-cv-505 (MAD/DEP), 2016 WL 3855180 (N.D.N.Y. July 12, 2016) ..................15

*N. Am. Knitting Mills, Inc. v. Int'l. Women's Apparel, Inc.*,
    No. 99 Civ. 4643 (LAP), 2000 WL 1290608 (S.D.N.Y. Sept. 11, 2000)...........15

*Ramgoolie v. Ramgoolie*,
    16-CV-3345 (VEC) (SN), 2018 WL 5619959 (S.D.N.Y. Aug. 3, 2018) ...............14, 18, 19

*Rhoda v. Rhoda*,
    No. 14 Civ. 6740 (CM), 2017 WL 11530950 (S.D.N.Y. June 22, 2017)...........20

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)...........................................................................9

*Ruotolo v. City of N.Y.*,
    514 F.3d 184 (2d Cir. 2008)..........................................................................25

*Schultz v. Sayada*,
    133 A.D.3d 1015 (3d Dep't 2015) ................................................................. 12

*SEC v. Kik Interactive, Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ........................................................... 22

*Senior Health Ins. Co. of Penn. v. Beechwood Re Ltd.*,
    345 F. Supp.3d 515 (S.D.N.Y. 2018) ............................................................ 20

*Shih v. Petal Card, Inc.*,
    No. 18 Civ. 5495 (JFK), 2020 WL 5659429 (S.D.N.Y. Sept. 23, 2020) ......... 12, 15, 19

*Shipping Inc. v. Half Moon Shipping, LLC*,
    848 F. Supp. 2d 448 (S.D.N.Y. 2012) ........................................................... 10

*Solutia Inc. v. FMC Corp.*,
    456 F. Supp. 2d 429 (S.D.N.Y. July 31, 2006) ...................................... 1, 10, 21

*Teachers Ins. & Annuity Assoc. of Am. v. Wometco Ent., Inc.*,
    833 F. Supp. 344 (S.D.N.Y. 1993) ............................................................... 19

*U.S. v. Ulbricht*,
    31 F.Supp.3d 540 (S.D.N.Y. 2014) ............................................................... 17

*USAirways Grp., Inc. v. British Airways PLC*,
    989 F. Supp. 482 (S.D.N.Y. 1997) ............................................................... 13

*WEB Mgmt. LLC v. Arrowood Indem. Co.*,
    No. 3:07–cv–424 (VLB), 2008 WL 619310 (D. Conn. July 31, 2008) ............. 20

*Yonfsky v. Wernick*,
    362 F. Supp. 1005 (S.D.N.Y. 1973) ............................................................. 16

*Zeising v. Kelly*,
    152 F. Supp. 2d 335 (S.D.N.Y. 2001) .............................. 10, 12, 13, 15, 16, 19

**Statutes**

15 U.S.C. § 78c (a)(4)(A) ..............................................................................................22
Section 15(a) ..................................................................................................................22
Section 15(b) ..................................................................................................................22
Section 29(b) ............................................................................................................22, 23

**Rules**

Fed. R. Civ. P. 15(a)(2) .................................................................................................25
Fed. R. Civ. P. 8(a) ...................................................................................................1, 15
Fed. R. Civ. P. 12(b)(6) ...........................................................................................9, 21

## I.    INTRODUCTION

Defendant Yoon Kim ("Kim"), CEO of Mochi Capital, LLC ("Mochi," and, with Kim, "Defendants"), entered into a joint venture agreement with Plaintiff Jalak Jobanputra ("Jalak" or "Plaintiff"), and then breached that agreement by retaining Jalak's 20% share of the profits the joint venture obtained entirely for themselves, in express violation of the parties' agreement. Now, Defendants understandably want to avoid liability for their actions. But their defective motion to dismiss ("Motion") cannot shield them from the consequences of their actions. The Motion should be denied in its entirety.

To start, none of Defendants' arguments are appropriate for a determination on a motion to dismiss, as all involve a fact-based inquiry. *See Solutia Inc. v. FMC Corp.,* 456 F. Supp. 2d 429, 443, n. 2 (S.D.N.Y. July 31, 2006) (whether a joint venture exists or a fiduciary duty is created are questions of fact); *Katz v. Zuckermann*, 481 N.Y.S.2d 271, 274-275 (Sup. Ct. Queens Cty. 1984) (enforceability of a contract is question of fact).

The Motion should also be dismissed because Jalak properly alleges all requirements of a joint venture, breach of fiduciary duty, breach of contract and unjust enrichment / quantum meruit sufficiently to put Defendants on fair notice of the claims and the basis for each claim, as Fed. R. Civ. P. 8(a) requires. With respect to her joint venture claim, Jalak clearly alleges the parties both manifested an intent to start a joint venture, created and operated that joint venture, and established a provision for its profits and losses (Mot. 6-10). The Complaint alleges the parties entered into a detailed agreement, in which they agreed they would start an investment vehicle for cryptocurrency investments, combining their respective experience, credentials, resources, and business network in the financial technology ("fintech") world. (Compl. ¶¶ 23-26.) The parties agreed to a provision for the sharing of profits and losses, wherein Jalak and

Kim would split any profits 20/80, respectively, and Jalak would share in any losses in exchange for a higher carry. (*Id.*) Further, the parties were to maintain joint control of the venture and each investment opportunity would need to be approved by both joint venturers. (*Id.*) The parties then acted on this agreement, with Jalak identifying multiple investments for the joint venture, and the joint venture purchasing those same cryptocurrencies. (*Id.* ¶¶ 27-41.) The parties held themselves out as the partners they were, both to each other and to third parties. As alleged in the Complaint, Kim emailed Jalak to discuss plans for the company and their investments. (*Id.*, Exh. B.) Kim even created a prospectus for potential investors, in which he explicitly held Jalak out as an equal partner in the venture and touted the parties' joint investments. (*Id.*, Exh. A at 23 (Investor presentation listing the joint venturers' "Prior Token Investments.").) Only after the cryptocurrencies the joint venture purchased became transferrable did Defendants, in breach of the parties' agreement, retain 100% of the profits of the venture for themselves, withholding Jalak's 20% share entirely. A joint venture, and its breach, is clearly alleged. *See Canet v. Gooch Ware Travelstead*, 917 F. Supp. 969, 988 (E.D.N.Y. 1996) (joint venture established where "venture was not at will but was for the accomplishment of a particular undertaking").

And, as Defendants themselves admit (Mot. 11), where a joint venture is established, a fiduciary duty is also alleged, which is the case here. *See Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004). In any event, the close relationship between the parties, and Kim's exclusive control over the venture's profits also establishes a fiduciary duty. *See Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006).

Defendants are plain wrong that an illegal contract is alleged, or that the Securities Exchange Act of 1934 ("Exchange Act") applies at all to this case (Mot. 12). No securities are at

issue here. This case involves cryptocurrency tokens. Defendants misconstrue the Securities Exchange Commission ("SEC") Order they cite: the SEC has not made a ruling that assets sold through Simple Agreement for Future Tokens ("SAFTs") are securities, and in fact, the SEC explicitly notes in its Order that its findings are fact specific and "not binding on any other person or entity in this or any other proceeding." Moreover, even if the Exchange Act did apply, Jalak does not qualify as a broker under any reading of the statute.

Defendants' argument that unjust enrichment/quantum meruit cannot be alleged to circumvent an illegal contract fares no better (Mot. 14), given that there is no illegal contract. In any event, Plaintiff is entitled to plead these claims in the alternative, and, even if there were an illegal contract (there was not), Defendants are not entitled to the windfall of that agreement. *See Katz*, 481 N.Y.S.2d at 274.

Defendants' arguments are all inappropriate for decision at this stage of the pleadings, and Jalak has sufficiently alleged all causes of action. She respectfully requests that the Court deny Defendants' Motion in its entirety.

## II.   RELEVANT ALLEGATIONS

### A.  Kim and Jalak Agree to Enter a Joint Venture

Jalak, an investment trailblazer in the financial technology markets, has built a well-earned reputation of being a "Top 100 Most Influential Fintech Leader" and a "Top 5 Investor Powering the Blockchain Boom." (Compl. ¶ 2.) Her business and investment credentials are matched only by her philanthropic and public service efforts, which span over two decades and range from training women entrepreneurs in Tanzania to serving on various education boards and government taskforces. (*Id*.) Because of her enviable credentials, Jalak is highly sought after as a consultant, advisor, and business partner. (*Id*.)

Defendant Kim was introduced to Jalak through friends in or around 2005 to 2006. (*Id.* ¶ 3.) Years later, Kim, whose experience in fintech markets is far less than that of Jalak, leveraged his friendship with Jalak "to approach her regarding a potential business arrangement." (*Id.* ¶ 22.)

Accordingly, in or around August 2017, Jalak and Kim entered into a joint business venture that would pool their respective expertise and resources to create opportunities for profit in cryptocurrency investments (the "Agreement"). (*Id.* ¶ 23.) Per the terms of the Agreement, Jalak would contribute her experience, credentials, and business network, including her proprietary investment analysis, to identify viable cryptocurrency investments, and Kim would provide liquid capital for the investments on behalf of the partnership. (*Id.* ¶ 24.) Jalak and Kim further agreed they would have joint control over the venture, with all investments requiring both parties' approval, and that all profits would be split 20/80, respectively, with the proceeds from each joint venture transaction distributed according to that split, once there was liquidity in the relevant cryptocurrency investment, that is, once the relevant cryptocurrency was transferable pursuant to the terms of each token sale ("Token Sale") such that both Jalak and Kim could realize their profits. (*Id.* ¶¶ 24-25.)

## B. The Joint Venture Invests in Token Sales and Becomes Profitable

Based on the Agreement, the parties got to work. Jalak identified an upcoming Token Sale by the Web 3 Foundation ("Web 3") for their Polkadot tokens ("DOTs"). (*Id.* ¶ 27.) Because of the exclusivity and limited availability of certain Token Sales, particularly in the early technological development stage, the fintech investing community at large often does not have access to certain Token Sales, including Web 3's. (*Id.*) Jalak leveraged her considerable community capital and investment expertise so that she and Kim would be able to access the

Token Sale.  (*Id*.)  Without Jalak, the joint venture would not have been able to access the DOTs

Token Sale, at the same time and on the same terms.  (*Id*.)

In September 2017, Jalak secured an allocation of DOTs for the joint venture.  Kim

advised that his limited liability company, Mochi Capital LLC, was an appropriate corporate

vehicle to purchase the DOT allocation.  (*Id*. ¶ 28.)  Between approximately September 25 to 27,

Jalak sent emails to Kim and Web 3 that made clear Jalak was the principal point of contact with

Web 3, with the investment simply being made through Mochi.  (*Id*.)  Consistent with this, and

in recognition that Jalak needed to be the principal point of contact with Web 3, as well as the

joint nature of their venture, Kim appointed Jalak as a director of Mochi.  (*Id*.)

On September 27, 2017, Jalak forwarded Kim the Web 3 SAFT to complete in order to

secure the allocation of DOTs.  (*Id*. ¶ 29.)  Kim, based out of New York, completed the SAFT on

behalf of Mochi on September 29, 2017, and sent to Web 3 a $150,000.00 USD contribution

from a New York bank account in this judicial district.  (*Id*.)  Kim also sent Web 3 a

cryptocurrency wallet address he controlled, which is where the partnership had agreed to

receive the DOTs.  (*Id*.)  Web 3 countersigned the SAFT on October 11, and distributed

5,320.101 DOTs to Kim's wallet on October 29, 2017.  (*Id*.)

On the date Web 3 transferred the DOTs to Kim's cryptocurrency wallet, the DOTs were

neither transferrable nor saleable because the network on which the DOTs could be used was still

under technological and administrative development.  (*Id*. ¶ 30.)  Indeed, under the terms of the

SAFT, the DOTs that were transferred to Kim's designated cryptocurrency wallet were non-

transferable until the "deployment of the Polkadot genesis block."  (*Id*.)  Although there was no

fixed date for deployment of the Polkadot genesis block, the SAFT provided that Web 3 would

use its best efforts to deploy it within two years of the September 2017 SAFT, but it was possible that it would be deployed within one year. (*Id*.)

Similarly, on or about November 2017, Jalak and Kim jointly invested in Blockstack's Token Sale through the joint venturers' fintech expertise, access, and resources. (*Id*. ¶ 31.) In exchange for $25,000 the joint venture received 208,333 STX, which is a cryptocurrency designed to operate on Blockstack's Stacks Network. (*Id*.) As with DOTs, STX were non-transferable and non-saleable when initially transferred to Kim's cryptocurrency wallet because the Stacks Network had not yet been fully deployed, but it was possible that it would be deployed within one year of the STX issuance. (*Id*.)

While Jalak and Kim waited for DOTs and STX to become transferrable and saleable, Web 3 launched in a series of phases beginning in July 2019. (*Id*. ¶ 32.)

Around the same time, Web 3 announced that all of its DOT token holders would be entitled to the issuance of an equal amount of Kusama coins ("KSM") for use on Polkadot's experimental, community-focused research and development network. (*Id*. ¶ 33.) Thus, Kim and Jalak were collectively entitled to 5,320.101 KSM in addition to the DOTs. KSMs became fully transferable and saleable in December 2019. (*Id*.) However, Kim has yet to transfer to Jalak her 20% of the 5,320.101 KSM, which would be 1,064 KSM. (*Id*.) Because of Kim's failure to transfer the KSM, Jalak has missed out on the opportunity to sell the KSM at a profit or, alternatively, profit from staking KSM since December 2019. (*Id*.)

In late 2019 and early 2020, Kim and Jalak explored the idea of expanding their joint venture to include a cryptocurrency assets venture capital fund that would include other investors. (*Id*. ¶ 34.) Because Jalak had the requisite experience and name recognition in the digital assets space, the venture capital fund was to be called "FP Capital," a nod to Jalak's

company, Future/Perfect Ventures.  (*Id.*)  In presentations for potential investors, Jalak and Kim held themselves out to third parties as the joint venturers that they were, and, consistent with the Agreement, Kim clearly represented that he and Jalak had jointly invested in both DOTs and STX and that these investments were jointly owned.  (*Id.*, Exh. A.)

In private correspondence between Kim and Jalak, Kim also referred to the DOT and STX investments as being made jointly.  (*Id.* ¶ 35.)  For example, on April 12, 2019, Jalak told Kim that he should include "the fact that we did Polka Dot + Blockstack together" in the investor presentation.  (*Id.*)  Kim responded the same day and stated that he "did mention both of them in the strategy overview as our ICO, i.e., non-public investment examples but will create summary pages for the deck as well."  (*Id.*, Exh. B.)

Ultimately, due to the COVID-19 pandemic, FP Capital never launched and the investments in DOTs, KSMs, and STX remained jointly those of Jalak and Kim.  (*Id.* ¶ 36.)

**C.      Kim Keeps the Profits for Himself, In Breach of the Joint Venture and His Fiduciary Duties to Jalak**

On or about August 18, 2020, DOTs became transferable. Around that same time, the Polkadot network redenominated its DOT tokens such that the original 5,320.101 DOTs issued to the joint venture were redenominated to 532,010.10 DOTs.  (*Id.* ¶ 37.)  Kim never transferred a single DOT to Jalak, let alone the agreed-upon 20%.  (*Id.*)  Because of Kim's failure to transfer the DOTs, Jalak has missed out on the opportunity to sell the DOTs at a profit or, alternatively, earn income from staking DOTs since August 2020.  (*Id.*)

As Jalak is and always has been the primary point of contact for Web 3, Jalak made Kim aware both of the transferability of the DOTs and their redenomination by e-mail.  Jalak received no response from Kim to that e-mail.  (*Id.* ¶ 38.)

STX became transferable and saleable in the United States on or about January 2021. Kim has never transferred a single STX to Jalak, let alone her 20% of the STX.  (*Id.* ¶ 39.) Because of Kim's failure to transfer the STX, Jalak has missed out on the opportunity to sell the STX at a profit or, alternatively, profit from stacking STX since January 2021.  (*Id.*)

For context, as of the date the Complaint was filed, the $175,000 in investments made by the joint venture was trading at a value of more than $17.1 million.  (*Id.* ¶ 6.)

Since August 18, 2020, Jalak has repeatedly e-mailed and called Kim demanding transfer of the 20% of the KSMs, DOTs, and STX that she is entitled under the terms of the Agreement. Kim has not answered her e-mails nor returned her phone calls.  (*Id.* ¶ 40.)

Kim's failure to transfer the DOTs, KSMs, and STX when those cryptocurrencies became transferable and saleable is a material breach of the Agreement.  (*Id.* ¶ 41.)  In addition to profiting from the investment in DOTs and KSM, Jalak could have derived consistent revenue from the staking of these cryptocurrency assets at a reward rate of approximately 13 to 15% interest on the assets staked.  With STX, Jalak could have earned Bitcoin in exchange for stacking her share of the STX.  (*Id.* ¶ 44.)  Because of Kim's actions, she could not.  (*Id.* ¶ 45.)

On August 20, 2021, Jalak filed suit for the profits she is owed, pursuant to the joint venture agreement she entered with Kim, alleging (1) breach of contract / joint venture agreement, (2) unjust enrichment, (3) quantum meruit, and (4) breach of fiduciary duty.

## III.    LEGAL STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014).  Thus, to survive a motion to dismiss, a complaint must plead only

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When reviewing a complaint, a district court "'must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), cert. denied, 568 U.S. 1087 (2013).

In addition, where allegations in a complaint are found to be deficient, under the Federal Rules, leave to amend is to be granted "freely . . . when justice so requires" and "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## IV. ARGUMENT

### A. Plaintiff Has Alleged a Breach of Joint Venture

A joint venture requires: "(1) a specific agreement manifesting the intent of the parties to be associated as joint venturers; (2) a contribution of property, financial resources, effort, skill or knowledge on the part of each party; (3) a provision for the sharing of profits and losses; and (4) some degree of joint control and joint management by the parties over the enterprise." *Zeising v. Kelly*, 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001). Whether a joint venture was created is generally a question of fact, inappropriate for decision on a motion to dismiss. *Solutia,* 456 F. Supp. 2d at 443, n. 2.

Plaintiff has adequately alleged all elements of a joint venture claim, including the first and third elements: there was both a specific agreement manifesting intent, and a provision for the sharing of profits or losses, as follows:

1.    The Parties Intended to Become Joint Venturers

Parties may prove their intent to create a joint venture "expressly through language in an agreement or impliedly through actions and conduct." *Fisher v. Tice*, No. 15cv955 (LAK) (DF), 2016 WL 4626205, at *12 (S.D.N.Y. July 5, 2016) (citations and quotations omitted); *see also Sea Shipping Inc. v. Half Moon Shipping, LLC*, 848 F. Supp. 2d 448, 458 (S.D.N.Y. 2012) ("a joint venture may exist based upon the *implied* agreement evidenced by the parties' conduct") (emphasis in original) (citations and quotations omitted).  Whether the parties manifested an intent to create a joint venture is a question of fact.  *Canet,* 917 F. Supp. at 988.

Here, Plaintiff alleges that the parties manifested their intent to start a joint venture, through both word and deed.  Specifically, the Complaint alleges that Kim, aware of Jalak's expertise in cryptocurrency investing, "approach[ed] her regarding a potential business arrangement."  (Compl. ¶ 23.)  On or about August 2017, the parties "negotiated and knowingly and willingly entered into a joint business venture," pursuant to which they agreed that Jalak would indeed "contribute her experience, credentials, and business network, including her proprietary investment analysis, to identify viable cryptocurrency investments, and Kim would provide liquid capital for the investments on behalf of the partnership."  (*Id*. ¶¶ 23-24.)  The two then agreed to certain specifics of the joint venture, including a 20/80 split of profits made from any jointly made investments on behalf of the venture, to be distributed once the cryptocurrency became transferrable, and that Jalak could convert her 20% share of the cryptocurrency into capital contributions to share in additional potential investment losses (in addition to the losses

suffered from her unpaid labor) in exchange for a higher 'carry' or share of the total realized profits." (*Id*. ¶¶ 24-26.) The parties further agreed that each investment opportunity needed to be approved by both of them. (*Id*. ¶ 26.)

The Complaint also alleges that the parties held themselves out as joint venturers to both themselves and third parties. Specifically, Kim prepared a PowerPoint presentation, attached as Exhibit A to the Complaint, in which he conveys that he and Jalak planned to create a venture capital fund focused on cryptocurrency assets to be called FP Capital, and touts their joint investments, including their "Prior Token Investments." (*Id*. ¶¶ 34-35, Exh. A.) The prospectus indicates that Jalak is a full partner with Kim in the venture. (*Id*.) In an April 12, 2019 email exchange between Jalak and Kim, also attached to the Complaint, Kim further acknowledges the partnership's joint investments in DOTs and STX and discusses the venture's plans moving forward. (*Id*., Exh. B.)

The Complaint then alleges a series of potential investments that Jalak did in fact identify, including the Token Sale by the Web3 Foundation, and a concomitant allocation of DOTs, and that the joint venture did in fact use the capital, as provided by Kim, to purchase the allocation of DOTs on behalf of the joint venture. (*Id*. ¶¶ 27-33.) Moreover, the joint venture did in fact profit from those investments – with Defendants illegally retaining Jalak's share of those profits, in breach of the parties' Agreement. (*Id*. ¶¶ 37-41.)

"These documentable facts, to say nothing of the [Complaint's] other detailed allegations regarding the content of the [parties'] oral discussions, plausibly allege" that Kim intended a joint venture with Jalak to capitalize on her expertise in cryptocurrencies. *See Shih v. Petal Card, Inc*., No. 18 Civ. 5495 (JFK), 2020 WL 5659429, at *10-11 (S.D.N.Y. Sept. 23, 2020) ("the totality of the parties' conduct plausibly alleges a legally enforceable partnership

agreement"); *see also Schultz v. Sayada*, 133 A.D.3d 1015, 1016–17 (3d Dep't. 2015) (finding "the evidence of the whole of their relationship amply demonstrates that they entered into a joint venture"); *Griffith Energy, Inc. v. Evans*, 85 A.D.3d 1564, 1565–66 (4th Dep't 2011) (affirming trial court's finding of intent based on the defendant's conduct).

Defendants posit that these allegations are "conclusory" (Mot. 7), but the only thing conclusory is Defendants' argument. Defendants point to a few summarizing lines, and ignore entire swaths of the Complaint, which outline the joint venture in significant detail. (*See* Compl. ¶¶ 27-33.) There can be no question that this "venture was not at will but was for the accomplishment of a particular undertaking," and that a joint venture is therefore alleged. *See Canet*, 917 F. Supp. at 988.

*Zeising v. Kelly*, relied on by Defendants (Mot. 7), is inapposite. There, plaintiff alleged that he had a number of conversations with defendants, in which they told him their idea for a financial exchange and said "they were looking for assistance in formulating a business plan, a financial model for such plan, and securing financing for the business plan." 152 F. Supp. 2d at 340. Plaintiff then created that business plan and "played a lead role in presenting the information to such potential investors," allegedly assisting defendants in obtaining "their first round of financing" and "lin[ing] up investors for the second round of financing." *Id*. In exchange, defendants promised to pay plaintiff a percentage of any financing they received. *Id*. In granting the motion to dismiss, the court held these allegations were insufficient to allege a joint venture because they did not show the parties' intent to create a joint venture but instead indicated "a simple contractual relationship" in which the "parties entered into an agreement, 'the purpose of which was to combine resources and efforts to create an effective business plan.'" *Id*. at 348.

In contrast to *Zeising*, Kim did not ask Jalak to simply draft a business plan for him or to help him to make a single investment, in exchange for a fee or a percentage of a single round of financing. Instead, as the Complaint clearly alleges, Jalak and Kim planned to create an investment vehicle together, in which they pooled their respective resources together to identify and invest in investment opportunities. (Compl. ¶¶ 23-26.) The parties did in fact invest in two separate investment opportunities but, in breach of their Agreement, Defendants failed to distribute to Jalak her 20% share of the profits the joint venture obtained. (*Id*. ¶¶ 27-41.) Nowhere in the Complaint is it alleged that Jalak was an employee of Kim's or Mochi's, and an uneven profit split does not suddenly morph Plaintiff into one. Plaintiff was Kim's business partner, and that is clearly alleged.

*USAirways Grp., Inc. v. British Airways PLC*, also relied on by Defendants, does not help them either. 989 F. Supp. 482 (S.D.N.Y. 1997). In that case, two entirely separate companies – US Airways and British Airways – entered "into a series of cooperative agreements," which the district court held was not sufficient to establish a joint venture. *Id*. at 493 ("What emerges from the complaint is that BA and USAir entered into several arms-length agreements as part of a general effort to cooperate with each other. No new entity or enterprise was created.") That is a far cry from the situation here, where Jalak and Kim created an entirely new investment vehicle together.

Instead, this case is much more like *Ramgoolie v. Ramgoolie,* 16-CV-3345 (VEC) (SN), 2018 WL 5619959 (S.D.N.Y. Aug. 3, 2018), in which the trial court refused to dismiss a breach of oral joint venture claim in circumstances very similar to the ones at issue here. There, plaintiff, a registered nurse, alleged that she and the defendant, a businessman, agreed to open a dialysis center together in Trinidad and Tobago. *Id*. at *3. Plaintiff alleged that, in their initial

conversations, the parties "agreed that Defendant would finance the venture," while plaintiff "would conduct research, assist in starting the business, and assist in managing its operations." *Id*. The parties further agreed to be 50-50 owners of the business, but that "any profits the business generated would first be paid to Defendant to compensate him for his initial investment, after which Plaintiff and Defendant would share profits and losses equally." *Id*. Over the next year and a half, in reliance on this agreement, plaintiff conducted extensive research on the dialysis industry, retained a consultant with expertise in opening international medical facilities, and started a business plan. *Id*. "Plaintiff never received a salary or other monetary compensation for her work." *Id*. Based on these allegations and the evidence produced in support of them, the court held "there is a genuine dispute of material fact with respect to whether the parties agreed to form a joint venture," and refused to grant summary judgment on the oral joint venture claim. *Id*. at *10.

Moreover, the cases Defendants cite for the proposition that Kim's statements as to the parties' "joint" investments are not enough to evince an intent to create a joint venture (Mot. 8) stand only for the proposition that language ***alone*** does not create a joint venture. *See, e.g., Mitsubishi Elec. Corp. v. Westcode, Inc*., No. 3:15-cv-505 (MAD/DEP), 2016 WL 3855180, at *3 (N.D.N.Y. July 12, 2016) ("statements addressing the parties' relationship as a joint venture or a partnership are not dispositive").[1] The fact is courts do consider the parties' statements and views of their relationship in determining whether they intended to create a joint venture. *See, e.g., Shih,* 2020 WL 5659429, at *11 (finding intent to create a joint venture established in part because defendant made statements, including: "Let's start a company together," "Let's create

_____

[1] *See also N. Am. Knitting Mills, Inc. v. Int'l. Women's Apparel, Inc*., No. 99 Civ. 4643(LAP), 2000 WL 1290608, at *2 (S.D.N.Y. Sept. 11, 2000) (no joint venture where parties called the arrangement a partnership but did not share joint control and management or profits and losses).

this things [*sic*]," and "Great we're on the same page overall," along with statements to third parties that he was working with plaintiff on the alleged joint venture).  Here, not only did Kim tout his partnership with Jalak, he also came to a detailed agreement with her that included the joint venture's purpose, the parties' joint management responsibilities, and a provision for sharing profits and losses.  (Compl. ¶¶ 23-26.)  Kim then supplied the capital for the joint venture and promoted those investments to third parties as joint investments, ultimately profiting enormously (and illegally) from the venture.  (*Id.* ¶¶ 27-41.)  The Complaint alleges both the intent to create a joint venture, and that a joint venture was actually formed.

   2. <u>Plaintiff Has Alleged the Parties' Intent to Share Profits and Losses</u>

  To satisfy the third element of a joint venture claim, a plaintiff must allege the joint venture had a "provision for the sharing of profits and losses." *Zeising*, 152 F. Supp.2d at 347. Plaintiff here has alleged both.

   a. <u>Jalak Alleges the Parties' Intent to Share Profits</u>

  With respect to profits, the Complaint alleges the parties agreed to an 20/80 split of the profits from the cryptocurrency investments the joint venture made, and to distribute the actual amounts once each respective cryptocurrency became transferrable and saleable.  (Compl. ¶¶ 25-26.)  Defendants attempt to recast this allegation to state that, instead of agreeing that Jalak would receive 20% of the profits, the parties actually agreed that Jalak would receive a "distribution" of 20% of the total cryptocurrencies, which purportedly does not qualify as profits, because (1) the cryptocurrencies at issue are not alleged to have been sold, and are therefore "paper profits," and (2) either party could end up with gains or losses that differ from the 20/80 split, after selling off the cryptocurrency they obtained from the joint venture.  (Mot. 9-10.)  Both arguments fail as a matter of law.

First, whether the cryptocurrencies were actually sold or not is irrelevant to the question of whether the parties agreed to a "***provision*** for the sharing of profits and losses," which is all that is required to allege a joint venture. *Zeising*, 152 F. Supp. 2d at 347 (emphasis added). Defendants offer no law for the supposition that profits actually have to be realized before a joint venture can be properly alleged. To the contrary, even if no business is transacted pursuant to a joint venture agreement, a cause of action for breach of a joint venture can still lie. *See, e.g., Yonfsky v. Wernick*, 362 F. Supp. 1005, 1020 (S.D.N.Y. 1973) ("An action at law will also lie when there is a breach of a joint venture agreement and no business has been transacted under the agreement—*i.e.*, when one joint adventurer is excluded by another."); *see also Glenmark, Inc. v. Carity*, 221 N.Y.S.2d 330, 335 (Sup. Ct. N.Y. Cty. 1961) ("Where an agreement of partnership or joint venture is breached *before* any business is done thereunder, as where one of the partners or joint venturers is excluded by another,. . . an action at law for damages will lie.") (emphasis in original). The extent or existence of profits may go to the question of damages; it does not go to the question of whether a joint venture was created in the first place.

Nor do Defendants cite any law for the proposition that the fact that the parties could later monetize their share of the cryptocurrency received from the joint venture means that the parties did not establish a provision to share profits (Mot. 10). By Defendants' logic, any time a partnership agrees to divide profits in anything other than fiat currency -- equity interest, for example – it would negate the creation of a joint venture. Obviously, this is not the law. *See, e.g., Growblox Sciences, Inc. v. GCM Administrative Services, LLC*, 14 Civ. 2280 (ER), 2016 WL 1275050, at *9 (S.D.N.Y. Mar. 31, 2016) ("intention to split the equity they would receive" indicated "parties undertook to share in profits and losses" of the alleged joint venture); *Ackerman v. Landes*, 493 N.Y.S.2d 59, 60 (2d Dep't. 1985) (joint venture alleged where parties

agreed to receive "25% aggregate share of the stock in a contemplated corporation").

Defendants cite no law indicating that joint venture profits have to be only in fiat currency, or that an agreement to share gains from cryptocurrency do not constitute "profits" under the law. *See, e.g., U.S. v. Ulbricht*, 31 F.Supp.3d 540, 548 (S.D.N.Y. 2014) (rejecting argument that there was "no legally cognizable 'financial transaction'" where "all transactions occurred through the use of Bitcoin" because "bitcoins carry value – that is their purpose and function – and act as a medium of exchange.").

 b. Jalak Alleges the Parties Agreed to a Provision for Sharing Losses

Moreover, the Complaint alleges a specific provision for losses, in which the parties agreed that Jalak had the option of "converting her share of cryptocurrency into capital contributions to share in potential investment losses (in addition to the losses suffered from her unpaid labor) in exchange for a higher 'carry' or share of the total realized profits."  (Compl. ¶ 26.)[2]  Defendants claim such a provision is insufficient because Jalak was not "bound" to share the losses (Mot. 10).  This is incorrect.  To the contrary, courts have repeatedly found a joint venture created where the parties agreed to a provision for losses that was optional or contingent on other factors.  *See, e.g., Ramgoolie*, 2018 WL 5619959, at *3, 10 (refusing to dismiss joint venture claim where parties agreed to share losses only if and when defendant was fully compensated for his initial investment); *Canet*, 917 F. Supp. at 989 (joint venture was formed when venturer contributed labor and expressed "willingness to assume" debt); *Lightbox*

---

[2] While sweat equity alone is generally not sufficient to establish a provision for losses, courts have found it is a contributing factor in determining whether the parties agreed to share of losses, when combined with other factors. *See, e.g., In re York Furniture Co.*, 32 B.R. 211, 214-15 (S.D.N.Y. 1983) (finding a joint venture based on the parties' "combination of resources," including one coventurer's financing of the transaction while other offered "services in return for share of profits").

*Ventures, LLC v. 3RD Home Limited*, No. 16cv2379 (DLC), 2016 WL 6562107, at *8 (S.D.N.Y. Oct. 28, 2016) (finding a joint venture where certain "unresolved issues," including whether one party was to retain certain commissions, remained); *In re PCH Assocs.*, 55 B.R. 273, 281 (S.D.N.Y. 1985) ("percentage rent provision coupled with [one party's] option to become a 50% equity partner certainly point to at least an implicit agreement to share any losses resulting from a future decline in the [] business," precluding dismissal of joint venture claim).

The fact that Kim put up the capital and therefore would suffer loss of that capital had the joint venture suffered any losses (Mot. 10) is immaterial. Indeed, "a joint venture may exist although participants suffer losses in different proportions," including where one party provides the capital for the venture. *See, e.g., Decker, Decker & Assocs., Inc. v. Assoc. of Nat. Advertisers, Inc*., 839 N.Y.S.2d 432, at *6 (Sup. Ct. 2007) (citations and quotations omitted); *Shih,* 2020 WL 5659429, at *4 (finding joint venture where "task of fundraising would be delegated entirely to" defendant); *Ramgoolie*, 2018 WL 5619959, at *3, 10 (joint venture where defendant put up all the capital). Here, Kim's capital was essential, but it was nothing without Jalak's identification of the correct investments and ability to reach out to the cryptocurrency community to make those investments. The parties negotiated and agreed to a specific provision for losses, which is all that is required to plead a joint venture. *See Zeising*, 152 F. Supp. 2d at 347.

### B. Plaintiff Has Sufficiently Alleged a Breach of Fiduciary Duty

As Defendants themselves admit (Mot. 11), "a joint venture creates a fiduciary relationship among the joint venturers." *Fisher*, 2016 WL 4626205, at *12; *see also Gibbs v. Breed, Abbott & Morgan*, 710 N.Y.S.2d 578, 581 (1st Dep't 2000) (fiduciary duty owed by members of partnership); *Cosy Goose Hellas v. Cosy Goose USA, Ltd.*, 581 F. Supp. 2d 606, 620

(S.D.N.Y. 2008) (joint venture partners owe each other a fiduciary duty).  Thus, because Plaintiff

has alleged a joint venture, she has alleged a fiduciary duty as a matter of law.

Jalak has also alleged a fiduciary duty independent of her joint venture allegations (Mot.

11).  The test for establishing a fiduciary relationship is well described in *Abercrombie*:

> To determine if a fiduciary relationship exists, "New York law inquires whether
>
> one person has reposed trust or confidence in the integrity and fidelity of another
>
> who thereby gains a resulting superiority or influence over the first."  *Teachers*
>
> *Ins. & Annuity Assoc. of Am. v. Wometco Ent., Inc*., 833 F. Supp. 344, 349-50
>
> (S.D.N.Y. 1993).  Thus, a fiduciary duty exists where one assumes control and
>
> responsibility over another, or where one has a duty, created by his undertaking.
>
> *See id*.; *see also Mandelblatt v. Devon Stores, Inc*., 132 A.D. 2d 162, 521 N.Y.S.
>
> 2d 672, 676 (App. Div. 1987) (noting that a "fiduciary relation exists between
>
> two persons when one of them is under a duty to act for or to give advice for the
>
> benefit of another upon matters within the scope of the relation" (quoting
>
> Restatement (Second) of Torts 874 cmt. a)).

438 F. Supp. 2d at 274; *see also Senior Health Ins. Co. of Penn. v. Beechwood Re Ltd*., 345 F.

Supp.3d 515, 524 (S.D.N.Y. 2018) ("in determining whether a fiduciary duty exists, the focus is

on whether one person has reposed trust or confidence in another and whether the second person

accepts the trust and confidence and thereby gains a resulting superiority or influence over the

first") (internal citations and quotations omitted).

Under these standards, even if she has not alleged a joint venture (she has), Jalak has still

alleged enough facts to survive a motion to dismiss on the fiduciary duty claim.  By virtue of the

use of his cryptocurrency wallet, Kim had exclusive control over the cryptocurrencies obtained

by the joint venture he entered into with Jalak. (Compl. ¶¶ 5-6, 25, 30-31, 33, 37-41.) Jalak reposed trust and confidence in Kim that, in receiving the cryptocurrencies for the joint venture and in exercising complete control over their disposition, he would transfer the agreed-upon 20% to Jalak as soon as the cryptocurrencies became transferable. (*Id.*) Under these circumstances, plainly, a fiduciary duty existed. *See Rhoda v. Rhoda,* No. 14 Civ. 6740 (CM), 2017 WL 11530950, at *21 (S.D.N.Y. June 22, 2017) (fiduciary duties existed where one party exercised "extensive (if not exclusive) control over [plaintiffs'] finances"); *WEB Mgmt. LLC v. Arrowood Indem. Co*., No. 3:07–cv–424 (VLB), 2008 WL 619310, at *2 (D. Conn. July 31, 2008) (fiduciary duty properly alleged where defendant was "in a uniquely dominant position over [plaintiff's] property sufficient to create a fiduciary relationship between the parties"); *Solutia,* 456 F. Supp. 2d at 456 (fiduciary relationship "where confidential and proprietary technology that goes to the heart of the parties' agreement is alleged to have been within the exclusive control of one of the parties to the negotiation").

Moreover, as with the joint venture claim, "[t]he existence of a fiduciary duty normally depends on the facts of a particular relationship, therefore a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Abercrombie*, 438 F. Supp. 2d at 274.

## C. Plaintiff Alleges a Valid, Enforceable Contract

Defendants are simply wrong that the Exchange Act applies at all to this case (Mot. 12). There are no securities alleged here. Defendants' entire argument is premised on the incorrect presumption that a digital asset sold through a SAFT is always a security. (Mot. 13, n. 2 (citing SEC Order, *In re Wireline, Inc*., Admin Pro. No. 3-20206, at 2 (https://www.sec.gov/litigation/admin/2021/33-10920.pdf)).) But Defendants misconstrue the

findings and letters they cite.  The *Wireline* ruling Defendants rely on simply does not stand for

the proposition that all SAFTs sell securities.  Instead, the settlement is limited to the particular

SAFT at issue in that case, as the SEC makes clear in its ruling, stating that its findings are

limited to the "facts and circumstances" of that particular case and to the "digital tokens offered

and sold by Wireline," and is "not binding on any other person or entity in this or any other

proceeding."  (SEC Order, *In re Wireline, Inc.*, Admin Pro. No. 3-20206, at 1, n.1, 2.)  The SEC

has made no ruling that all digital assets sold through SAFTs are securities and Defendants cite

no law or SEC ruling to the contrary.[3]  The Exchange Act simply does not apply.

      Moreover, even if the tokens at issue here were securities (they are not), Jalak was not a

broker-dealer under the Exchange Act.  State and federal securities laws prohibit the payment to

non-registered broker-dealers in securities transactions.  Section 15(a) of the Exchange Act

requires persons engaged in broker or dealer activity to register with the SEC pursuant to Section

15(b) of the Exchange Act.  The Exchange Act broadly defines "Broker" as one who is "engaged

in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c

(a)(4)(A).  To determine whether a party has acted as a broker, courts consider whether the

alleged broker:  (1) is an employee of the issuer of securities; (2) receives transaction-based

commission; (3) sells, or previously sold, the securities of other issuers; (4) participates in

negotiations between the issuer and investor; (5) makes valuations regarding the merits of the

investment or gives advice; and (6) actively finds investors.  *See Foundation Ventures, LLC v.

F2G, LTD.*, No. 08 Civ. 10066(PKL), 2010 WL 3187294, at *5 (S.D.N.Y. Aug. 11, 2020).  It is

the moving party's burden to establish a violation of section 29(b) of the Exchange Act, which

---

[3] *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020), also relied on by Defendants
(Mot. 13, n. 2), does not say that tokens sold through SAFTs are securities either, but addressed
"Kin," a particular token at issue in that case.

requires that the movant show a contract that involved a prohibited transaction; contractual

privity with the opposing party; and that the movant is in the class of persons the Exchange Act

was designed to protect. *Id*. at *6.

Defendants have not, and cannot, meet this standard, especially at the pleading stage.

Plaintiff is not alleged to have sold securities, is not alleged to have been an employee of anyone,

has not sold any tokens for the token sellers or any other sellers, did not negotiate or draft the

SAFT in the Complaint, and did not actively find any investors.  Any argument that she acted as

a broker is therefore clearly lacking.  *See id*. at *7 (denying motion to dismiss when, *inter alia*,

there was "no indicia that [plaintiff] sells or previously sold securities of other issuers… [or],

participates in negotiations between the issuer and the investor.")

The token sale consummated through the SAFT transaction alleged in the Complaint is

not an illegal transaction.[4]  The whole premise of Defendants' claim argument is legally

erroneous and does not reflect at all what is alleged.  Defendants' claim that the transaction here

was in any way illegal fails as a matter of fact and law.

### D.    Plaintiff Has Sufficiently Alleged Equitable Claims

Given that there is no illegal contract, Defendants' argument that Plaintiff cannot plead

equitable claims to avoid an illegal contract (Mot. 14) crumbles entirely.  Moreover, even when

there is a question as to the validity of a contract, a plaintiff can plead equitable claims in the

alternative.  *See Astroworks, Inc. v. Astroexhibit, Inc*., 257 F. Supp. 2d 609, 621 (S.D.N.Y.

---

[4] Moreover, even if the contract were illegal (which it is not), Defendants seek a windfall, claiming that Jalak's claim to payment "is voidable at the option of the innocent party" (Mot. 14) when Defendants have unclean hands.  Defendants willingly entered into the alleged agreement and accepted Jalak's contributions to the joint venture and cannot now seek to void its obligations.  *See Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 892, 906 (W.D.N.Y. 1983) (party that "willingly entered into the questioned contract and knew of all the facts. . . may not invoke the provisions of section 29(b) to challenge the contract.")

2003); *CBS Broadcasting Inc. v. Jones*, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006) ("alternative pleading rules may allow for an unjust enrichment claim where there is a question as to the validity or enforceability of a contract")

In addition, it is untrue that the existence of an illegal contract automatically precludes a recovery under an equitable theory (Mot. 14). To the contrary, where, as here, a contract is prohibited by statute and is not criminal in nature, courts may make a finding of unjust enrichment in order to avoid a windfall to the defendant. *See Katz*, 481 N.Y.S.2d at 274; *see also Foundation Ventures*, 2010 WL 3187294, at *4 (contract that violates a statute may be enforced "where the party who is alleged to have breached the contract is attempting to improperly use public policy as a sword for personal gain rather than a shield for the public good") (citations and quotations omitted). Such a determination requires a fact-based analysis, dependent on the facts of any individual case. *Katz*, 481 N.Y.S.2d at 274.

*Katz v. Zuckermann* is instructive. In *Katz*, plaintiffs, technicians in EEG and ECHO testing, alleged that they entered into an oral agreement with the defendant, a licensed physician, in which the parties were to contribute jointly to the purchase of EEG and ECHO testing machines. *Id*. at 273. According to the agreement, plaintiffs were to administer the tests, and "the parties would divide, on a fifty-fifty basis, money received for all tests given by plaintiffs as well as expenses for maintenance of the machines and office facilities." *Id*. After plaintiff sued the defendant for, *inter alia*, unjust enrichment for failing to provide plaintiffs with their proportionate share of the profits, defendant argued that plaintiffs could not recover because the agreement was illegal, given that plaintiffs were unlicensed technicians who could not legally administer the machines. In rejecting the argument, the New York court refused to dismiss the

unjust enrichment claim and allow the defendant to profit from his own wrongdoing. As the *Katz* court put it:

> Under these facts and circumstances the court will not permit the doctor to disavow his obligations based upon his own wrongdoing where he clearly has received valuable services. As a matter of fact, the defendant has received monetary compensation for the services performed exclusively by the plaintiff.

*Id.* at 274.

As in *Katz*, what Defendants essentially argue here is that they, but not Plaintiff, should profit entirely from what they claim is an illegal contract. Obviously, this is not the law. The Agreement at issue is not illegal, but, even if it were, Defendants should not succeed in arguing that Plaintiff cannot sue for what she is owed under that agreement, while at the same time accepting the full benefit of the same agreement. Instead, the question of whether the contract should be enforced is a question of fact that should not be determined at this stage of the pleadings. *See id.*

### E.     Leave to Amend Is Favored Over Dismissal

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Dismissal of a complaint without leave to amend is usually reserved for extraordinary circumstances, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman*, 371 U.S. at 182). These circumstances are not present here and thus, in the event the Court finds any deficiencies in the Complaint, Jalak respectfully requests leave to amend.

# V. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.

Dated: January 3, 2022          Respectfully Submitted,

/s/ Teresa L. Huggins
_____
Brian E. Klein
Teresa L. Huggins
WAYMAKER LLP
777 S. Figueroa St., Suite 2850
Los Angeles, California 90017
Tel.: (424) 652-7800/Fax: (424) 652-7850
E-mail: bklein@waymakerlaw.com
E-mail: thuggins@bakermarquart.com