UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JALAK JOBANPUTRA,

                Plaintiff,

- against -

YOON KIM, and MOCHI CAPITAL, LLC,

                Defendants.

**OPINION & ORDER**
21 Civ. 7071 (ER)

Ramos, D.J.:

Jalak Jobanputra brings this action against Yoon Kim and Mochi Capital, LLC, alleging that they are withholding her share of the profits resulting from the parties' joint cryptocurrency investment venture. Doc. 1. Pending before the Court is Defendants' motion to dismiss for failure to state a claim. Doc. 19. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I. BACKGROUND[1]

### a. The Parties

Jobanputra, a financial and blockchain technology ("fintech") expert with over 20 years of experience in venture capital, ¶ 16, is domiciled in Florida but at all relevant times was a resident of New York, ¶ 8. Kim, the head of research at a digital asset fund, ¶ 23, is a citizen and resident of New York, ¶ 9. Mochi, which is completely controlled and managed by Kim, is organized under the laws of Delaware and has its principal place of business in New York. ¶¶ 10–11. During all relevant times Mochi was, and remains, the alter-ego of Kim. ¶ 11

---

[1] The following facts are based on the allegations in the complaint, which the Court accepts as true for the purposes of the instant motion. Unless otherwise noted, citations to "¶ __" refer to the complaint, Doc. 1.

### b. The Joint Venture

Kim and Jobanputra met in 2005 or 2006 through mutual acquaintances and for years afterwards maintained a cordial friendship. ¶ 3.  In August 2017, Kim, whose experience in fintech is considerably less than that of Jobanputra, reached out to Jobanputra to discuss a joint business venture, whereby Jobanputra and Kim would pool their respective expertise and resources to make cryptocurrency investments. ¶ 3–4.  Jobanputra considered Kim's offer only because the venture fund that she managed at the time—and in which Kim was an investor—did not permit her to invest in crypto assets. ¶ 4.  Ultimately, Jobanputra agreed, and the parties orally entered into a joint business venture (the "Agreement") that month. *Id.*

According to the terms of the Agreement, Jobanputra would contribute her experience, credentials, and business network, including her proprietary investment analysis, to identify viable cryptocurrency investments, and Kim would provide liquid capital for the investments. ¶ 5.  Profits would be split, with Jobanputra receiving 20% and Kim receiving the remaining 80%. ¶ 24.  Apart from her 20% stake, Jobanputra's work would be unpaid. *Id.*  Jobanputra further had the option of converting her share of the cryptocurrency into capital contributions so that she would share in potential investment losses—in addition to the losses suffered from unpaid labor—in exchange for a higher share of profits. ¶ 25.

Every investment required Jobanputra and Kim's joint approval. ¶ 26.  Some of the investments made by Jobanputra and Kim were in cryptocurrencies that were in the process of technological development and, thus, were not immediately transferrable.  Jobanputra and Kim agreed that the profits would be distributed once the relevant cryptocurrency was transferrable. ¶ 25.  Specifically, they could realize profits either by selling the assets or by using the assets on

their respective networks (e.g., by "staking"[2] rewards). *Id.* Because Kim would be transferring the capital for the investments, the assets from each investment would be distributed once the tokens became transferable pursuant to the terms of each token sale. *Id.*

### c. The First Investment: Polkadot (DOTs and KSMs)

Early into their venture, Jobanputra identified an opportunity to invest in Polkadot tokens ("DOTs"), a cryptocurrency being issued by the Web 3 Foundation ("Web 3"). ¶ 27. Though this opportunity was not available to the crypto community at large, Jobanputra leveraged her considerable network to access the token sale. *Id.* In September 2017, she secured an allocation of DOTs for the joint venture. ¶¶ 27–28. Kim advised Jobanputra that Mochi would be an appropriate corporate vehicle through which to purchase the DOTs. ¶ 28. Jobanputra, however, was to be the main point of contact with Web 3. *Id.* Accordingly, Kim appointed Jobanputra as a director of Mochi at the end of that month. *Id.*

To execute the purchase, in October 2017, Kim entered into an agreement with Web 3 (the Simple Agreement for Tokens, or "SAFT") on behalf of Mochi and paid Web 3 $150,000. ¶ 29. Kim also sent Web 3 a cryptocurrency wallet address controlled by Kim, which would receive the DOTs. ¶ 29. On October 29, 2017, Web 3 distributed 5,320.101 DOTs to Kim's crypto-wallet. ¶ 30. Because the network on which the DOTs could be used, Polkadot, was still under technological development, the DOTs were not transferable at that time. *Id.* Additionally, the SAFT specified that the DOTs could not be transferred until the "deployment of the Polkadot genesis block" and that Web 3 would use its best efforts to deploy the genesis block within two years. *Id.*

---

[2] Staking is the process by which the owner of tokens on a particular blockchain network assist with validating transactions in exchange for payment in form of cryptocurrency. Staking can be lucrative, but validators risk losing their tokens if they approve transactions that do not conform to the database's internal rules.

Approximately a year and a half later, in July 2019, Web 3 announced that holders of DOTs were entitled to an equal amount of Kusama ("KSM") tokens for use on Polkadot's network. ¶ 33. The partnership thereby became entitled to 5,320.101 KSMs (in addition to their 5,320.101 DOTs), which did not become fully transferable until December 2019. *Id*. At that point, pursuant to the Agreement, Kim was entitled to her share of KSMs. To date, however, Kim has not given Jobanputra her 20% stake (1,064 KSMs). As a result, since December 2019, Jobanputra has missed out on the opportunity to sell KSM at a profit or, alternatively, profit from staking KSM. *Id.*

By August 18, 2020, the DOTs became transferable; that day, Jobanputra notified Kim of their transferability via email, but Kim never responded. ¶ 37–38. As of August 21, 2020, the Polkadot changed the denomination of its DOT token. *Id.* ¶ 37. Accordingly, the original 5,320.101 DOTs issued to Kim's crypto wallet were redenominated to 532,010.10 DOTs. *Id*. Kim has not yet transferred to Jobanputra her 20% of the DOTs to which she is entitled to under the SAFT (106,402.02 DOTs after redenomination). *Id*. As a result, since August 2020, Jobanputra has missed out on the opportunity to sell DOT at a profit or, alternatively, profit from staking DOT. *Id*

### d. The Second Investment: Blockstack (STX Tokens)

One month after the initial investment, in November 2017, Jobanputra and Kim invested in token sale of Blockstack, another cryptocurrency database; Kim paid $25,000 for 208,333 STX tokens, a cryptocurrency designed to operate on Blockstack's Stacks Network. ¶ 31. When the STX were initially transferred to Kim's cryptocurrency wallet, they were non-transferable because the Stacks Network had not yet been deployed. *Id.* The STX tokens became transferable in January 2021. ¶ 39. Kim has not yet transferred to Jobanputra her 20% of the

STX tokens to which she is entitled to under the Agreement (41,667 STX tokens). *Id*. As a result, since January 2021, Jobanputra has missed out on the opportunity to sell STX at a profit or, alternatively, profit from staking STX. *Id.*

### e. The Investor Presentation

In late 2019 and early 2020, approximately two and a half years into the venture, Jobanputa and Kim considered including other investors in their joint venture. ¶ 39. A presentation that they prepared for prospective investors represented that they jointly invested in both DOT and STX tokens, and that these investments were owned by both of them. *Id.* In private correspondence between Kim and Jobanputra, Kim also referred to the DOT and STX investments as being made jointly. ¶ 39. An April 12, 2019, email from Jobanputra to Kim, for example, said that Kim should include in the presentation "the fact that [they] did Polka Dot + Blockstack together." *Id.* Kim responded the same day, stating that he "did mention both of them in the strategy overview . . . but will create summary pages for the deck as well." *Id.*

### f. The Deterioration of the Relationship

Since each of the cryptocurrencies became transferable, Jobanputra has repeatedly emailed and called Kim, demanding her 20% of the KSM, DOT, and STX tokens to which she is entitled under the Agreement. ¶ 40. However, Kim has not responded to her emails, and in November 2020, Jobanputra discovered that Kim's telephone number had been disconnected. *Id.*

## II. Procedural History

Jobanputra filed this action on August 20, 2021,. Doc 1. Against both Defendants, Jobanputra alleges: (1) breach of contract, ¶¶ 47–51, (2) unjust enrichment, ¶¶ 52–56, and (3) quantum meruit, ¶¶ 57–61. Against Kim, Jobanputra also brings a fourth claim for breach of

fiduciary duty.  ¶¶ 62–65.  On October 19, 2021, Defendants submitted a letter motion for conference on their anticipated 12(b)(6) motion, Doc. 14, to which Jobanputra objected on October 22, 2021, Doc. 15.  The Court held the conference on November 12, 2021.  On December 3, 2021, Defendants moved to dismiss the complaint in its entirety.  Doc. 19.

### III.   Legal Standard

#### a.   Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

### IV.   Discussion

Accepting Jobanputra's allegations as true, the Court finds for the reasons set forth herein that the complaint fails to allege a joint venture or any other facts that make plausible a fiduciary relationship between Kim and Jobanputra.  Accordingly, Jobanputra's first claim is dismissed to the extent that it purports to allege the breach of a joint venture agreement.  Jobanputra's fourth

claim for breach of fiduciary duty against Kim is also dismissed.  The motion to dismiss is otherwise denied.

### a. Fiduciary Duty

To establish a claim for breach of fiduciary duty under New York law, a plaintiff must prove:  (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)).  Relevant here is the question of whether the complaint adequately alleges that Jobanputra or Kim owed each other such duty.

A joint venture creates fiduciary duties between contracting parties.  *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004).  A fiduciary duty may also be found between "one person [who] has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first."  *Teachers Ins. & Annuity Assoc. of Am. v. Wometco Ent., Inc.*, 833 F. Supp. 344, 349–50 (S.D.N.Y. 1993).

Jobanputra bases her breach of fiduciary duty claim on the existence of a purported joint venture between herself and Kim.  *See* ¶ 63 ("*Pursuant to the joint venture partnership* entered into by [Jobanputra] and Kim as alleged herein, Kim owed fiduciary duties of care, loyalty, and good faith to [Jobanputra].") (emphasis added).  The Court finds that Jobanputra has not sufficiently pleaded the existence of a joint venture or the establishment of a fiduciary relationship.

### i. Joint Venture

"[A] joint venture is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a

partnership." *Ely v. Perthuis*, No. 12 Civ. 1078 (DAB), 2013 WL 411348, at *6 (E.D.N.Y. Jan. 29, 2013) (internal quotation marks and citations omitted). To establish a joint venture under New York Law, a party must plead the following essential elements:

> (1) two or more parties entered an agreement to create an enterprise for profit, (2) the agreement evidences the parties' mutual intent to be joint venturers, (3) each party contributed property, financing, skill, knowledge, or effort to the venture, (4) each party had some degree of joint management control over the venture, and (5) there was a provision for the sharing of both losses and profits.

*Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171 (citing *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Service Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990)).

### 1. Intent

Whether parties have manifested intent to form a joint venture is a question of fact, *see Canet v. Gooch Ware Travelstead*, 917 F.Supp. 969, 987 (E.D.N.Y. 1996), the answer to which is crucial to the determination of whether such an arrangement existed, as "a joint venture is a *voluntary* relationship, the origin of which is wholly *ex contractu*." *Id.* (emphasis added) (quoting *Precision Testing Laboratories, Ltd. v. Kenyon Corp. of America*, 644 F.Supp. 1327, 1348–49 (S.D.N.Y. 1986)) (internal quotation marks omitted). "This manifestation of intent need not be explicit, but the parties must be clear that they intend[ed] to form a joint venture, which is a fiduciary relationship, and not a simple contract." *Id.* (internal quotation marks omitted); *see also Sea Shipping Inc. v. Half Moon Shipping, LLC*, 848 F. Supp. 2d 448, 458 (S.D.N.Y. 2012) ("a joint venture may exist based upon the *implied* agreement evidenced by the parties' conduct") (emphasis in original) (internal quotation marks and citations omitted). "[O]ral joint ventures . . . may evince [the intent of parties] to be bound as joint venturers by commingling their property, skills, and efforts such that their individual contributions are subject to their co-venturers' actions, efforts, and failures." *See Fisher v. Tice*, No. 15 Civ. 955 (LAK)

(DF), 2016 WL 4626205, at *11 (S.D.N.Y. Jul. 5, 2016) (internal quotation marks and citations omitted), *report and recommendation adopted*, No. 15 Civ. 955, Doc. 77 (Sept. 8, 2016).

Here, the Court finds that the allegations in the Complaint plausibly establish that the parties intended to enter into an oral agreement to be associated as joint venturers. The complaint alleges that the parties "negotiated and knowingly and willingly entered into a joint business venture," pursuant to which it was agreed that Jobanputra would "contribute her experience, credentials, and business network, including her proprietary investment analysis, to identify viable cryptocurrency investments, and Kim would provide liquid capital for the investments on behalf of the partnership." ¶ 23–24. The complaint further alleges that the parties contemplated a "20/80 [profit] split," ¶ 5, and that they had to both agree before making any investment, ¶ 26.

Beyond these allegations, an investor presentation that the parties purportedly used to market their venture to potential third-party investors represents Jobanputra and Kim as the sole members of the investment fund's "leadership team" and reflects their joint ownership of DOTS and STX tokens. *See* Doc. 1-1, the Investor Presentation, at 24–25. This presentation, paired with the fact that Kim and Jobanputra allegedly prepared to solicit third parties to invest in their fund, lends support to the idea that the parties intended to engage an enterprise bound by more than simple contract. *Id.* at 23. Communications between the parties further strengthen Jobanputra's case. In an April 12, 2019 email, for example, Jobanputra told Kim that he should include "the fact that [they] did Polka Dot + Blockstack together" in the investor presentation. Doc. 1-2, April 12, 2019 Email. In response, Kim stated that he "did mention both of them in the

9

strategy overview as *our* ICO,³ . . . but will create summary pages for the deck as well." *Id.* (emphasis added).

In light of the above, the Court cannot conclude at this stage that the parties did not manifest intent to enter into a joint venture.

### 2. Loss Sharing

As noted, however, another "indispensable essential of a contract of . . . joint venture . . . is a mutual promise or undertaking of the parties to share in the profits of the business *and submit to the burden of making good the losses.*" *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d. Cir. 2003) (emphasis in original) (internal quotation marks omitted) (quoting *Steinbeck v. Gerosa*, 4. N.Y.2d 302, 317 (N.Y. 1958). "If there was no agreement as to the manner in which the parties were to share in the profits and the losses, the agreement did not create a joint venture." *See Tice,* 2016 WL 4626205, at *14 (internal quotation marks omitted) (quoting *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171–72). Moreover, the great weight of caselaw makes clear that

> a putative venturer's loss of anticipated profits from a collaborative business effort is not sufficient to make that individual a joint venturer, and that a putative joint venturer who only stands to lose the value of his or her services rendered in connection with the venture does not submit himself or herself to the liabilities and losses of the venture and thus is not considered a joint venturer."

*Cosy Goose Hella v. Cosy Goose USA, Ltd.*, 581 F.Supp. 2d 606, 620–21 (S.D.N.Y. 2008) (collecting cases). "Indeed, if one only stands to lose his or her contribution to the joint venture, the risk of loss element becomes indistinguishable from the separate requirement that each joint venturer make some contribution of property, financing, skill, knowledge or effort to the venture." *Tice*, WL 4626205, at *14 (internal quotation marks omitted) (quoting *B. Lewis*

---

³ The phrase "ICO" refers to "initial coin offering." *See* Doc. 1 at 11 n.2.

*Prods., Inc. v. Angelou*, No. 01 Civ. 530 (MBM), 2003 WL 21709465, at *12 (S.D.N.Y. July 23, 2003), *aff'd in part*, 99 Fed.Appx.294 (2d Cir. 2004)); *see also Artco, Inc. v. Kiddie, Inc.*, No. 88 Civ. 5734 (MJL), 1993 WL 962596, at *10 (S.D.N.Y. Dec. 28, 1993) (If "simply expending efforts to set up a venture were sufficient to satisfy the essential element of sharing of losses, the requirement could nearly always be satisfied. . . ."); *Dinaco, Inc.*, 346 F.3d at 68 (finding that a royalty agreement would not satisfy the loss-sharing requirement for a joint venture because plaintiff "never guaranteed or agreed to guaranty [its supposed joint venture's] financial or contractual obligations."). While "[l]oss sharing need not be equal among all parties to a joint venture, . . . it must extend beyond the loss of individual services invested in the venture." *Tice*, WL 4626205, at *14 (internal citation omitted).[4]

To prove that the complaint sufficiently alleges a loss sharing provision, Jobanputra analogizes to *Ramgoolie v. Ramgoolie,* 16-CV-3345 (VEC) (SN), 2018 WL 5619959 (S.D.N.Y. Aug. 3, 2018), *report and recommendation adopted in relevant part,* 2018 WL 4266015 (S.D.N.Y. Sept. 6, 2018). There, a registered nurse alleged that she and the defendant, a businessman, agreed to open a dialysis center together in Trinidad and Tobago. *Id*. at *3. The parties "agreed that [d]efendant would finance the venture," while plaintiff "would conduct research, assist in starting the business, and assist in managing its operations." *Id*. The parties

---

[4] A minority of courts, however, have deemed an agreement to bear loss of "the value of [one's] services and [one's] contributions" a sufficient loss sharing provision for a joint venture, or "that when there is no reasonable expectation that the joint venture will suffer losses . . ., the law will imply an agreement to share losses in a manner similar to the parties' agreement to share profits." *Cosy Goose*, 581 F.Supp.2d 606 at 621 (collecting cases) (adopting the majority approach of requiring a joint venture to include a fiscal loss sharing provision). These decisions, however "have come under heavy scrutiny and derision from judges [in the Southern District of New York] for not being in accord with the elements of a joint venture under New York law." *Id.* (citations omitted). Additionally, this so-called "minority rule" has not been adopted either by the Second Circuit or the New York Court of Appeals. *See Tice*, WL 4626205 at *15. So as to remain consistent with the great weight of case law—and distinguish between the third and fifth elements of a joint venture (thereby giving effect to each of the five prongs of the common law rule), *see Tice*, WL 4626205, at *14—this Court declines to apply the minority rule.

11

further agreed to be 50-50 owners of the business, but that "any profits the business generated would first be paid to [d]efendant to compensate him for his initial investment, after which [p]laintiff and [d]efendant would share profits and losses equally." *Id*. Over the next year and a half, plaintiff conducted research on the dialysis industry, retained a consultant with expertise in opening international medical facilities, and started a business plan. *Id*. "Plaintiff never received a salary or other monetary compensation for her work." *Id*. Based on these allegations and the evidence produced in support of them, the court held "there [was] a genuine dispute of material fact with respect to whether the parties agreed to form a joint venture" and denied the parties' cross-motions motion for summary judgment.

Jobanputra's reliance on *Ramgoolie* is misplaced. First, the facts in *Ramgoolie* are not analogous to the facts at hand. Jobanputra neglects to mention that plaintiff's memorandum in opposition to defendant's motion for summary judgment alleges that she "contributed $78,525.00 (TT) in capital to [the purported joint venture]," for which she was never paid back. *See* No. 16 Civ. 3345 Doc. 127 at 17. Plaintiff pointed to that fact as "actual factual proof of [her] sharing in the [venture's] losses." *Id.* Accordingly, plaintiff, there, made a showing that she stood "to lose [*more*] than] the value of . . . her services," as is required by the great weight of caselaw. *See Cosy Goose*, 581 F.Supp. 2d 606, 620-21 (S.D.N.Y. 2008).

What's more, the court's decision in *Ramgoolie* did not "analyze whether all of the elements of a joint venture were met," since the key inquiry for purposes of the order "[was] whether [the parties] had a meeting of the minds . . . and actually entered into a specific agreement to do business together." *Ramgoolie*, 2018 WL 5619959, at *9.[5] The court's

---

[5] The relevant text of the *Ramgoolie* opinion reads: "Plaintiff attests that she made an oral agreement with Defendant in July 2010 to open a dialysis center in Trinidad and Tobago. Plaintiff argues that this constituted an agreement to form a joint venture. . . . But the crux of the parties' dispute is whether they had a meeting of the minds in July 2010 and actually entered into a specific agreement to establish a dialysis business together. Defendant flatly

12

decision, therefore, does not grapple with the question of loss sharing, mentioning the subject only once in the facts, *see id.*, at *3, once in its recitation of the joint venture standard, *id.* at *9, and once in a footnote (wherein the court highlights a *discrepancy* between the complaint's characterization of the loss-sharing arrangement, and plaintiff's deposition testimony), *id.* at *9 n.3. Indeed, the court ultimately denied Ramgoolie's motion for summary judgment with respect to her breach of duty claim because she failed to discuss that claim at all in her briefing. *Id.* at *9. For these reasons, the Court does not find *Ramgoolie* analogous.

Jobanputra also relies on *Canet* in support of her position. 917 F.Supp at 988. But this case, too, is not analogous. There, the court found a joint venture where an employee who assumed a leadership role in a building project—but who invested no more than "sweat" equity (i.e., his labor)—expressed willingness to "undertake recourse debt in connection with" the venture. *Id.* Not once, however, does Jobanputra allege that she was prepared to undertake *any* debt in connection with the investment venture. Indeed, the term "debt" never appears in the complaint; nor do the facts alleged give rise even to the suggestion that Jobanputra was prepared to personally absorb the liabilities of the fund should the venture fail.

As already explained, caselaw makes clear that the dispositive question is whether Jobanputra "*submit*[ed] *to the burden of making good the losses*" that the fund could incur or, put differently, whether Jobanputra "guaranteed or agreed to guarantee [the venture's] financial . . . obligations." *Dinaco, Inc.*, 346 F.3d at 68. The complaint simply does not suggest that

---

denies that the parties ever made an oral agreement in July 2010. He asserts that Plaintiff was merely an administrator and employee of [the venture] who was never entitled to any ownership interest in the business. Thus, the Court need not analyze whether all of the elements of a joint venture were met." WL 5619959 at * 8–9.

Jobanputra was liable to lose *anything* apart from her time and potential profits.[6] And as discussed, that, alone, is not enough. *See, e.g.*, *Cosy Goose*, 581 F.Supp. at 620–21.

For these reasons, the Court finds that the Jobanputra has failed to make the requisite showing of a loss-sharing arrangement. Because such an arrangement is essential to the formation of a joint venture, the Court finds that the complaint fails to plead a joint venture.[7] Accordingly, Jobanputra's breach of fiduciary duty claim must rest on other grounds if it is to survive Defendants' motion.

### ii. Trust & Balance of Power

Fiduciary duties can exist outside of joint ventures. To establish a claim for a breach of fiduciary duty under New York law, a plaintiff must prove "the existence of a fiduciary duty[.]" *Johnson*, 660 F.3d at 138. "In certain limited and unusual circumstances there may be special factors that create fiduciary relationships between contracting commercial parties[.]" *Calvin Klein Trademark Trust v. Sachner*, 123 F.Supp.2d 731, 734 (S.D.N.Y. 2000) (collecting cases). Jobanputra argues that one such instance is when "one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006); *see also Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S. 2d 672, 676 (2d Dep't 1987) (noting that a "fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for

---

[6] The Court is unmoved by the argument that Jobanputra could have lost equity if she opted to convert her share of tokens to investment equity and then lost that equity. In such a scenario, Jobanputra would have effectively "lost . . . anticipated profits," which is insufficient to satisfy the loss sharing requirement. *Cosy Goose*, 581 F.Supp. at 620–21.

[7] Because this holding is dispositive of the question of whether the parties formed a joint venture, the Court need not consider whether the parties formed a sufficient profit-sharing scheme, or any of the other essential elements of a joint venture.

the benefit of another upon matters within the scope of the relation") (internal quotation marks and citation omitted).

Although not expressly alleged in the complaint, Jobanputra now argues that the pleaded facts give rise to the reasonable inference that Kim exercised "superiority or influence" over her, such that it created a fiduciary duty. *See* Doc. 21 at 25 (quoting *Senior Health Ins. Co. of Penn. v. Beechwood Re Ltd.*, 345 F. Supp.3d 515, 524 (S.D.N.Y. 2018)). She bases this contention on the fact that she trusted Kim and that he had "exclusive control over the [wallet containing] the cryptocurrencies obtained by the venture." *See id.* She analogizes this dynamic to that present in *Rhoda v. Rhoda*, wherein the court found a fiduciary duty to exist where one party exercised "extensive (if not exclusive) control over [plaintiffs'] finances." No. 14 Civ. 6740 (CM), 2017 WL 11530950, at *21 (S.D.N.Y. Jun. 22, 2017).

There are two issues with this argument. First, the complaint repeatedly characterizes Jobanputra and Kim as partners, *see generally* Doc. 1, suggesting an equal, or near-equal, power dynamic between the parties uncharacteristic of the narrow subset of business relationships into which courts have read fiduciary obligations. Consistently, the complaint specifies that both parties needed to consent to an investment before one could be made. ¶ 26. It, moreover, notes that Jobanputra was the primary point of contact with at least one of the operators of a cryptocurrency into which the parties' invested, ¶ 28; and that she, as a fintech expert with more than twenty years of experience in the field, bore the responsibility of identifying fruitful investments, ¶ 16. These facts, alone, preclude a finding that Jobanputra occupied a position notably subservient to that of Kim.

Furthermore, the case Jobanputra cites in support of her claim, *Rhoda*, involved a mother serving as her daughter's business manager—a relationship quite unlike the one at hand. *See generally* 2017 WL 11530950. And the other case she relies on, *WEB Mgmt. LLC v. Arrowood*

*Indem. Co.*, involved a relationship wherein defendant held "unfettered discretion" over plaintiff's letter of credit.  No. 3:07–cv–424 (VLB), 2008 WL 619310, at *2 (D. Conn. July 31, 2008).  Kim held no such discretion over how the parties used his equity; dual consent was required.  ¶ 26.  Of further distinction, both of the cases Jobanputra relies on involved facts wherein the inferior party stood to experience a *personal financial loss*, as a result of the abuse of the superior party's mismanagement of their assets.  *See id.*; *see generally* 2017 WL 11530950.  As discussed, the same cannot be said of Jobanputra.  For these reasons, the Court finds that complaint fails to make plausible that Jobanputra's relationship with Kim falls within the small number of "unusual circumstances" that give rise to fiduciary duties.

### b. The Complaint Alleges an Enforceable Contract

Defendants allege that Jobanputra acted as an unregistered broker in violation of securities law and that, therefore, the Agreement is void.  The court disagrees.

Section 15(a) of the Securities Exchange Act of 1934 (the "Act") requires a person acting as a broker or dealer to register with the Securities and Exchange Commission (the "SEC") pursuant to Section 15(b) of the Act.  The Act broadly defines "Broker" as someone "engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c (a)(4)(A).[8]

---

[8] The Court disagrees with Jobanputra's contention that cryptocurrencies do not count as securities within the meaning of the Act.  The Act defines "security" include investment contracts, 15 U.S.C.A. § 78c(a)(10), and the Supreme Court has defined an investment contract to be "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party[.]"  *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946).  Recently, courts in this district have applied the Howey test to determine that cryptocurrency tokens intended to be sold on a blockchain or in the general market were securities within the meaning of the Securities Act.  *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019); *U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020).  Jobanputra points to no case to the contrary.  *See* Doc. 21 at 26–27.  Accordingly, the Court treats the tokens discussed herein as securities.

16

To determine whether a party has acted as a broker, courts consider a number of factors, including whether the purported broker:  (1) is an employee of the issuer of the securities; (2) receives transaction-based commission as opposed to a salary; (3) sells, or previously sold, the securities of other issuers; (4) participates in negotiations between the issuer and the investor; (5) makes valuations regarding the merits of the investment or gives advice; and (6) finds investors actively rather than passively.  *See Foundation Ventures, LLC v. F2G, Ltd.*, 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010) (citing *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003)).

Here, Defendants allege that Jobanputra acted as an investment professional by "soliciting investors[,] assisting in structuring securities transactions[,] provid[ing] advice regarding the merits of investments[,] helping identify potential investors[,] and participating in deal negotiations."  *See* Doc. 20 (citing ¶¶ 23–29).  They also assert that Jobanputra alleges a fee-based compensation structure, in that the size of her purported entitlement directly correlates to the size and success of each investment; the SEC has deemed this kind of arrangement a "hallmark of broker-dealer activity."  *Id.* (quoting SEC No-Action Letter (May 15, 2010) (https://www.sec.gov/divisions/marketreg/mrnoaction/2010/brumbergmackey051710.pdf)).

In response, Jobanputra contends that numerous facts weigh in favor of finding that she did not act as a broker dealer.  She emphasizes that the complaint does not allege that she was an employee of anyone, sold tokens for any other sellers, negotiated or drafted contracts with cryptocurrency sellers, or that she actively sought out any investors.  *See* Doc. 21 at 28.  Indeed, to the extent that the venture subsequently sought to include other investors, the complaint alleges that Kim played an active role in preparing the presentation.

The Court agrees with Jobanputra. This is a difficult question of fact, and the allegations set forth in the complaint do not make implausible the idea that Jobanputra did *not* act as a broker. Where, as here, certain factors weigh *against* finding that a party has acted as a broker— and where material questions of fact surround the party's dealings—courts will deny motions to dismiss, pending discovery. *See, e.g.*, *Foundation Ventures, LLC v. F2G, LTD.*, No. 08 Civ. 10066 (PKL), 2010 WL 3187294, at *5 (S.D.N.Y. Aug. 11, 2020) (denying a motion to dismiss on similar grounds, where there was "no indicia that [the plaintiff] . . . sold securities of other issuers . . . [or] participate[d] in negotiations between the issuer and the investor).

While the complaint *does* allege a transaction-based payment structure and that Jobanputra gave investment advice, it does *not* allege that she was an employee of anyone or that she sold the securities of other issuers. Furthermore, it is unclear whether she participated in negotiations with sellers. Accordingly, the Court denies Defendants' motion to dismiss the breach of contract action on these grounds.

### c. Equitable Claims

Defendants argue Jobanputra's unjust enrichment and quantum meruit claims are an attempt to circumvent an illegal contract and should therefore be dismissed. *See* Doc. 20 at 19. Having found, however, that Jobanputra adequately pleads an enforceable contract, the Court rejects this argument.

### d. Leave to Amend

Jobanputra requests leave to amend her complaint to address any deficiencies found by the Court. Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has instructed courts not to dismiss a complaint "without granting leave to amend at least once when a liberal

18

reading of the complaint gives any indication that a valid claim might be stated." *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)).  In *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, the Second Circuit reaffirmed the "liberal spirit" of Rule 15 and counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims.  797 F.3d 160, at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (per curiam)).  An amendment is futile and should not be granted if it "fails to cure prior deficiencies." *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) (quotation and citation omitted).

Here, the motion to dismiss has been granted in part due to the complaint's failure to allege a joint venture between the parties.  However, a valid claim might yet be stated.  Accordingly, Jobanputra is granted leave to amend the complaint to allege that the parties entered into a joint venture in no later than October 21, 2022.

### V.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part, and DENIED in part.  The parties are directed to appear at a telephonic case management conference on October 14, 2022 at 10:30 a.m.  The parties should dial 977-411-9748 and enter access code 3029857# when prompted.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 19.

It is SO ORDERED.

Dated:  September 28, 2022
        New York, New York

Edgardo Ramos, U.S.D.J.