UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JALAK JOBANPUTRA,

                Plaintiff,

– against –

YOON KIM *and* MOCHI CAPITAL, LLC,

                Defendants.

**OPINION & ORDER**

21-cv-7071 (ER)

RAMOS, D.J.:

    Jalak Jobanputra brought claims against Yoon Kim and Mochi Capital, LLC for allegedly withholding her share of the profit resulting from the parties' joint cryptocurrency investment venture. Doc. 1. Mochi and Kim answered, and Kim counterclaimed for breach of fiduciary duty, unjust enrichment, and quantum meruit, in connection with the parties' subsequent attempt to expand their alleged joint venture to include outside investors. Doc. 37. Kim also issued 23 non-party document subpoenas in support of his counterclaims.

    Before the Court are Jobanputra's motions to dismiss the counterclaims for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 60), and to quash the non-party subpoenas under Rules 26 and 45 of the Federal Rules of Civil Procedure (Doc. 43). For the reasons set forth below, the motion to dismiss is GRANTED, and the motion to quash is DENIED as moot without prejudice.

**I.    BACKGROUND**

    **A. Statement of Facts**

    *1. The Parties*

    Jobanputra is a financial technology ("fintech") expert with over 20 years of experience in venture capital. Doc. 1 ¶¶ 2, 16. This includes having founded the venture capital fund Future\Perfect Ventures ("FPV") in 2014. *Id.* ¶ 16. Kim, the head of research at a digital asset fund, *id.* ¶ 21, controls and manages Mochi Capital, LLC,

which is organized under the laws of Delaware and was, and remains, the alter-ego of Kim. *Id.* ¶¶ 10–11.

### 2. Initial Business Venture

Kim and Jobanputra met in 2005 or 2006 through mutual acquaintances and for years afterwards maintained a cordial friendship. *Id.* ¶ 3. In August 2017, Kim, whose experience in fintech is considerably less than that of Jobanputra, reached out to her to discuss a joint business venture, whereby they would pool their respective expertise and resources to make cryptocurrency investments. *Id.* ¶¶ 3–4. Jobanputra considered Kim's offer only because the venture fund that she managed at the time—and in which Kim was an investor—did not permit her to invest in crypto assets. *Id.* ¶ 4. Ultimately, Jobanputra agreed, and the parties orally entered a joint business venture that month ("the Agreement"). *Id.*

According to the terms of the Agreement, Jobanputra would contribute her experience, credentials, and business network, including her proprietary investment analysis, to identify viable cryptocurrency investments, and Kim would provide funding for the investments. *Id.* ¶ 5. Profits would be split, with Jobanputra receiving 20% and Kim 80%. *Id.* ¶ 24. Apart from her 20% stake, Jobanputra's work would be unpaid. *Id.* Jobanputra further had the option of converting her share of the cryptocurrency into capital contributions so that she would share in potential investment losses—in addition to the losses suffered from unpaid labor—in exchange for a higher share of profits. *Id.* ¶ 26.

Pursuant to their agreement, every investment required Jobanputra and Kim's joint approval. *Id.* Some of the investments made by Jobanputra and Kim were in cryptocurrencies that were in the process of technological development and, thus, were not immediately transferrable. *Id.* ¶ 25. Jobanputra and Kim agreed that the profits would be distributed once the relevant cryptocurrency was transferrable. *Id.* Specifically, they could

realize profits either by selling the assets or by using the assets on their respective networks (*e.g.*, by "staking"[1] rewards). *Id.*

Under this arrangement, the two invested together in various cryptocurrencies over the next two and a half years. *Id.* ¶ 6. But, when Jobanputra became entitled to her share of 20% of the cryptocurrencies, Kim did not transfer Jobanputra's share to her. *Id.* ¶¶ 33, 37–39. As a result, she has missed out on the opportunity to sell her tokens at a profit, or alternatively, profit from staking the tokens. *Id.*

3. *Subsequent Business Venture*

Because the initial investments were having some success, in late 2019, Kim alleges he and Jobanputra agreed[2] to open a cryptocurrency enterprise to outside investors with a new fund, FP Capital. Doc. 37 (Am. Answer & Countercl.) ¶ 8.[3] Pursuant to the agreement, Jobanputra would seek outside investors while Kim would handle the day-to-day management responsibilities of the fund. *Id.* FP Capital sought a total of $25 million in outside investments. *Id.* ¶ 13. Based only the 2% annual management fees, Jobanputra and Kim expected to share revenue of approximately $2 million over FP Capital's four-year initial term. *Id.*

FP Capital's general partner was FP Capital GP, LLC ("FP Capital GP"), which listed in its formation documents that Kim and Jobanputra were its sole members, each with 50% shares in its profits and losses. *Id.* ¶ 11. FP Capital's investment manager was FP Cap Management, LLC ("FP Manager"), which likewise listed in its formation

---

[1] Staking is the process by which the owner of tokens on a particular blockchain network assist with validating transactions in exchange for payment in form of cryptocurrency. Staking can be lucrative, but validators risk losing their tokens if they approve transactions that do not conform to the database's internal rules.

[2] Jobanputra disputes that the parties *agreed* to launch FP Capital and instead alleges that they merely "*explored* the idea of expanding their [existing] joint venture" with FP Capital but ultimately "never launched" it. Doc. 1 ¶¶ 34–36 (emphasis added).

[3] Unless otherwise noted, citations to paragraphs in Doc. 37 refer to paragraphs in the Amended Counterclaims, rather than in the Answer.

documents that Kim and Jobanputra were its sole members, each with 50% shares in its profits and losses.  *Id.* ¶ 12.

Jobanputra and Kim worked together to create promotional and administrative materials for the fund, including an investor presentation and Private Placement Memorandum ("PPM").  *Id* ¶ 9.  The PPM referred to FP Capital as "[t]he Partnership" and outlined Jobanputra and Kim's joint "proprietary investment process."  *Id.*

Kim alleged he hired and worked with fund counsel, administrators, and auditors; prepared fund documents, developed the fund investment strategy; and met with potential investors.  *Id.* ¶ 14.  Indeed, in January 2020, when Jobanputra told Kim she did not have the money to pay her obligations and suggested shutting down FP Capital, Kim paid her portion of the fund expenses.  *Id.*  But Kim alleges Jobanputra did not perform; and, by February 2020, he was increasingly concerned about FP Capital's viability because she had not attempted to seek investors for the fund.  *Id.* ¶¶ 14–15.  Kim proposed alternative arrangements to try to salvage the fund, but Jobanputra rejected the ideas and "effectively abandoned FP Capital at that point."  *Id.* ¶ 15.

Simultaneously, Kim alleges that Jobanputra was, unbeknownst to him, raising a third investment fund through her venture capital fund to invest in cryptocurrencies and initial coin offerings.  *Id.* ¶ 16.  Kim alleges that Jobanputra therefore abandoned FP Capital to cut Kim out of his share of the profits.  *Id.* ¶ 17.

### B.  Procedural History

Jobanputra commenced an action against Kim and Mochi on August 20, 2021, alleging that Kim had withheld her share of the proceeds from the initial investments, and asserting claims of breach of contract, unjust enrichment, quantum meruit, and breach of fiduciary duty.  Doc. 1.  Kim and Mochi moved to dismiss all of Jobanputra's claims on December 3, 2021.  Doc. 19.

The Court dismissed the breach of fiduciary duty claim, as well as the breach of contract claim to the extent it was based on the breach of a joint venture agreement, on

September 28, 2022, but it otherwise denied Defendants' motion. Doc. 29 (Opinion & Order). The Court held that Jobanputra had not sufficiently pled the existence of a joint venture because she had not alleged that the parties had agreed to share losses, nor had Jobanputra established any other circumstances giving rise to a fiduciary relationship. *Id.* at 7–16. But the Court held that, even if Jobanputra had not properly pled a joint venture, Jobanputra had adequately alleged an enforceable contract. *Id.* at 16–18. Although the Court granted Jobanputra's request for leave to amend her complaint (*id.* at 18–19), she did not so amend.

Kim and Mochi answered the complaint on October 28, 2022 (Doc. 32), and Kim also counterclaimed (and amended the counterclaims on January 26, 2023) for breach of fiduciary duty, unjust enrichment, and quantum meruit (Doc. 37). Jobanputra moved to dismiss the amended counterclaims on March 23, 2023. Doc. 60.

In support of his counterclaims, Kim issued 23 substantively identical non-party document subpoenas ("the Subpoenas") on July 29, 2022 seeking information from non-party limited partners in Jobanputra's fund, FPV. *See, e.g.*, Doc. 26-1 (Sample Subpoena). Jobanputra moved to quash the subpoenas on February 23, 2023. Doc. 43.

## II. LEGAL STANDARD

The applicable standard for a motion to dismiss a claim pursuant to Rule 12(b)(6) also applies to a motion to dismiss a counterclaim pursuant to Rule 12(b)(6). *Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*, No. 16-cv-9918 (ER), 2018 U.S. Dist. LEXIS 27258, at *3 (S.D.N.Y. Feb. 20, 2018) (citing *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12-cv-6017 (KBF), 2013 WL 342922, at *2 (S.D.N.Y. Jan. 18, 2013); *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 531 F. Supp. 2d 620, 622 (S.D.N.Y. 2008)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the

5

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20-cv-1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

### III.  DISCUSSION

Jobanputra moves to dismiss each of Kim's counterclaims—for breach of fiduciary duty, unjust enrichment, and quantum meruit—under Rule 12(b)(6). The Court grants the motion. The Court moreover denies as moot Jobanputra's motion to quash the

Subpoenas without prejudice and directs the parties to meet and confer regarding the scope and continued propriety of the Subpoenas, if any, in light of the instant decision.[4]

### A. The Breach of Fiduciary Duty Claim is Dismissed

To establish a claim for breach of fiduciary duty under New York law, a plaintiff must prove:  (1) the existence of a fiduciary duty, (2) a knowing breach of that duty, and (3) damages resulting therefrom.  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citations omitted).  Jobanputra argues that Kim failed to establish any of the required elements.  Doc. 61 at 16–27.

As to the first element, Kim alleges Jobanputra owed him a fiduciary duty by virtue of the parties' agreement to launch FP Capital, which he alleges was a joint venture.  Doc. 37 at 15, ¶¶ 19–21; Doc. 68 (Opp. to Mot. to Dismiss) at 11–15.  A joint venture creates fiduciary duties between contracting parties.  *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004).[5]  To establish a joint venture under New York Law, a party must plead the following essential elements:

> (1) two or more parties entered an agreement to create an enterprise for profit, (2) the agreement evidences the parties' mutual intent to be joint venturers, (3) each party contributed property, financing, skill, knowledge, or effort to the venture, (4) each party had some degree of joint management control over the venture, and (5) there was a provision for the sharing of both losses and profits.

---

[4] Kim originally asserted that the Subpoenas are relevant primarily to his now-dismissed counterclaims. Doc. 28 (Kim Opp. to Jobanputra's Letter Mot. for Leave to Move to Quash) at 2.  Thereafter, however, he also argued that the Subpoenas may additionally pertain to his defense against Jobanputra's claims, including some which the Court has since dismissed.  Doc. 58 (Kim Opp. to Mot. to Quash) at 4.  Because many of the claims upon which the Subpoenas rely have been dismissed since Kim issued the Subpoenas, the Court directs the parties to meet and confer to reevaluate whether a continued basis for the Subpoenas exists and, if so, their appropriate scope.  If Kim elects to reissue the Subpoenas or a narrowed version thereof, and Jobanputra continues to believe quashal necessary, she may renew her motion to quash.

[5] A fiduciary duty may also be found between "one person [who] has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." *Teachers Ins. & Annuity Assoc. of Am. v. Wometco Ent., Inc.*, 833 F. Supp. 344, 349–50 (S.D.N.Y. 1993) (citations omitted).  Jobanputra disputes that any fiduciary duty arises here based on such an argument. Doc. 61 at 22–23.  But Kim does not rely on such an argument and solely argues that a fiduciary duty arose from the joint venture.  *See* Doc 68 at 11–15.  The Court therefore need not decide whether Jobanputra owed Kim any fiduciary duty arising from other than that from the purported joint venture.

*Id.* (citing *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Service Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990)). Jobanputra argues that Kim failed to plead the second, fourth, and fifth elements and, accordingly, no joint venture—and therefore fiduciary duty—existed. Doc. 61 at 17–22. Those elements are addressed in turn below.

   *1. The Counterclaim Sufficiently Pleads that the Parties Intended to Be Joint Venturers*

"Parties can evince their intent to be joined as joint venturers expressly through language in an agreement or impliedly through actions and conduct." *Cosy Goose Hellas v. Cosy Goose USA. Ltd.*, 581 F. Supp. 2d 606, 620 (S.D.N.Y. 2008) (citing *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171). "This manifestation of intent need not be explicit, but the parties must be clear that they intend[ed] to form a joint venture, which is a fiduciary relationship, and not a simple contract." *Shore Parkway Associates v. United Artist Theater Circuit, Inc.*, No. 92-cv-8252 (JFK), 1993 WL 361646, at *3 (S.D.N.Y. Sept. 14, 1993) (citations omitted). This requirement will be satisfied where the parties "evince[d] their intent to be bound as joint venturers by commingling their property, skills, and efforts such that their individual contributions are subject to their co-venturers' actions, efforts, and failures." *Cosy Goose Hellas*, 581 F. Supp. 2d at 620 (citing *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171).

In considering Kim's motion to dismiss Jobanputra's complaint, this Court held that Jobanputra had adequately pleaded that the parties intended to be joint venturers by virtue of their actions and conduct, which implied the requisite intent. Doc. 29 at 8–10. Specifically, the Court pointed to the complaint's allegations that:

- "the parties 'negotiated and knowingly and willingly entered into a joint business venture,' pursuant to which it was agreed that Jobanputra would 'contribute her experience, credentials, and business network, including her proprietary investment analysis, to identify viable cryptocurrency investments, and Kim would provide liquid capital for the investments on behalf of the partnership'";
- "the parties contemplated a '20/80 [profit] split'";
- the parties "had to both agree before making any investment";

- "an investor presentation that the parties purportedly used to market their venture to potential third-party investors represent[ed] Jobanputra and Kim as the sole members of the investment fund's 'leadership team' and reflect[ed] their joint ownership of the DOTS and STX tokens"; and

- communications between the parties reiterated that the parties acted "together."

*Id.* (citing Doc. 1).

Here, as before, it is undisputed that no written joint venture agreement exists. Doc. 61 at 17–18; Doc. 68 at 12–13. And Kim's allegations here closely resemble those that the Court previously held sufficient to plead an intent to become joint venturers. The counterclaim alleges:

> Kim and Jobanputra negotiated and knowingly and willingly entered into a joint business venture, pursuant to which it was agreed that Kim and Jobanputra would each contribute their experience, credentials, and business networks to identify viable cryptocurrency investments, and would both seek outside investors. It was agreed that Jobanputra would spend more time seeking outside investors, while Kim would spend more time handling the day-to-day management responsibilities of the fund. Jobanputra and Kim referred to themselves as partners in FP Capital.

Doc. 37 ¶ 8. It further quotes from an investor presentation that the parties prepared to market their venture to potential third-party investors, which describes Jobanputra and Kim as the "leadership team." *Id.* ¶ 9. Kim does not, however, indicate that the parties had to agree before making investments, explicitly state the split of profits in the joint venture (as opposed to in the general partner or investment manager entities, as discussed further below), or point to internal communications between the parties. Although the allegations in Kim's counterclaims are thus not quite as robust as those in Jobanputra's complaint, the Court nonetheless holds that Kim has pled, sufficiently to survive a motion to dismiss, that the parties intended to be joint venturers. *See* Doc. 29 at 8–10; *Cosy Goose Hellas*, 581 F. Supp. 2d at 620; *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171.

> 2. *The Counterclaim Fails to Sufficiently Plead that Each Party Had a Degree of Joint Management Control Over the FP Capital Venture*

"Perhaps the most important criterion of a joint venture is the joint control or management of the joint property used in accomplishing its aims." *Allen Chase & Co. v. White, Weld & Co.*, 311 F. Supp. 1253, 1260 (S.D.N.Y. 1970) (citation omitted). "The control deemed essential for a joint venture is power over decision-making." *Stratford Group, Ltd. v. Interstate Bakeries Corp.*, 590 F. Supp. 859, 863 (S.D.N.Y. 1984) (citations omitted); *see also New York v. Grand River Enters. Six Nations, Ltd.*, No. 14-cv-00910 (MAT), 2019 U.S. Dist. LEXIS 21558, at *29 (W.D.N.Y. Feb. 11, 2019) (finding element satisfied where parties "were required to consult with each other before making important strategic decisions about marketing and distribution of [the] products"). Accordingly, a joint venture will not exist where one party has all, or virtually all, of the management of the business, and the other lacks independent decision-making authority or co-management or control. *See, e.g., Int'l Equity Invs., Inc. v. Opportunity Equity Partners., Ltd.*, 472 F. Supp. 2d 544, 553 (S.D.N.Y. 2007) (holding no joint management control existed where one party "exercised no control over the business of the side-by-side investments," even if it had an "advisory and oversight role," because it lacked "management" control); *Orderline Wholesale Distribs., Inc. v. Gibbons, Green, Van Amerongen, Ltd.*, 675 F. Supp. 122, 127 (S.D.N.Y. 1987) (holding that a party with a role like that of "a passive investor" was not a partner with joint management control for purposes of establishing a joint venture); *McGhan v. Ebersol*, 608 F. Supp. 277, 284 (S.D.N.Y. 1985) (holding that no joint management control existed where one party's "powers and responsibilities were limited by [the other] and [the former] was not able to operate outside of [the latter's] direction and control").

As noted above, the counterclaims do not allege that the parties had to agree before making any investments with respect to FP Capital.[6] Kim alleges that he alone hired and worked with fund counsel, administrators, and auditors; prepared fund documents; developed the fund investment strategy; and met with potential investors—all without any input from Jobanputra. Doc. 37 ¶ 14. He alone paid the fund's expenses. *Id.* Jobanputra's role, in comparison, was simply to seek outside investors and purportedly pay a portion of the fund expenses, neither of which she in fact did. *Id.* at 12 ¶ 8, 15 ¶ 20. These allegations are insufficient to establish joint management control. *See Int'l Equity Invs., Inc.*, 472 F. Supp. 2d at 553; *Orderline Wholesale Distribs., Inc.*, 675 F. Supp. at 127; *McGhan*, 608 F. Supp. at 284. Accordingly, no joint venture—and therefore no fiduciary duty—may exist, and Kim's counterclaim must be dismissed.

3. *The Counterclaim Fails to Sufficiently Plead that the Parties Agreed to Share Losses from FP Capital*

Kim's allegations of a joint venture and concomitant fiduciary duty also fail for the independent reason that he has failed to allege that the parties agreed to share losses in FP Capital. Without an agreement to share losses, no joint venture can exist, even if the parties agreed to share profits. *Turner v. Temptu Inc.*, No. 11-cv-4144 (JMF), 2013 U.S. Dist. LEXIS 114298, at *16–17 (S.D.N.Y. Aug. 13, 2013) (collecting cases); *see also Artco, Inc. v. Kidde, Inc.*, No. 88-cv- 5734 (MJL), 1993 WL 962596, at *10 (S.D.N.Y. Dec. 28, 1993) (If "simply expending efforts to set up a venture were sufficient to satisfy the essential element of sharing of losses, the requirement could nearly always be satisfied."). Moreover, the agreement to share losses must be with respect to the joint venture itself, not individual agreements arising therefrom. *See USAirways Grp. v. British Airways Plc*, 989 F. Supp. 482, 493 (S.D.N.Y. 1997).

---

[6] By contrast, in the complaint, Jobanputra alleged that both she and Kim had to agree before making investments in the cryptocurrencies in their initial business venture. Doc. 1 ¶ 26.

11

Kim alleges he and Jobanputra each agreed to equally share the profits and losses of the FP Capital GP and FP Manager. Doc. 37 ¶¶ 11–12; *see also* Doc. 68 at 13–14. But it is not apparent from these allegations that the parties intended to share losses in *FP Capital itself*, rather than the two independent entities affiliated with it. Kim does not allege what roles FP Capital GP or FP Manager would play in anticipated FP Capital investment opportunities, nor how money would flow and be allocated amongst the entities. Accordingly, the Court cannot find from these allegations that the parties intended to share *FP Capital's* losses. *See USAirways Grp.*, 989 F. Supp. at 493.

Because the Court has already held that the counterclaim did not plead the existence of a fiduciary duty for failure to establish all elements of a joint venture, the Court need not reach the parties' remaining arguments as to breach and damages.

### B. The Unjust Enrichment and Quantum Meruit Claims are Dismissed

"Under New York law, quantum meruit and unjust enrichment claims are analyzed together as a single quasi-contract claim." *Nat'l Util. Serv., Inc. v. Tiffany & Co.*, No 07-cv-3345 (RJS), 2009 WL 755292, at *9 (S.D.N.Y. Mar. 20, 2009) (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)); *see also Snyder v. Bronfman*, 921 N.E.2d 567, 569 (N.Y. 2009) ("Unjust enrichment and quantum meruit are, in this context, essentially identical claims, and both are claims under a contract implied . . . in law to pay reasonable compensation." (alteration in original) (internal quotation marks omitted)). To recover in quantum meruit, a plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson Catskill Rural Migrant Ministry, Inc.*, 418 F.3d at 175 (citation omitted). Similarly, to recover under a theory of unjust enrichment, a plaintiff must establish that (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) equity and good conscience militate against permitting the defendant to retain what the plaintiff is seeking to recover.

*Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  Under either theory, the "essence" of the claim "is that one party has received money or a benefit at the expense of another."  *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted).

Kim alleges that he hired and worked with fund counsel, administrators, and auditors; prepared fund documents; developed the fund investment strategy; and met with potential investors.  Doc. 37 at 14, ¶ 14.  But he alleges he received "no compensation for his work" on FP Capital even though he "reasonably expected to be compensated for his services in the form of equal shares of the profits and fees on any investment made by FP Capital."  *Id.* at 16 ¶¶ 16, 20–22.  He therefore concludes that it would be "against equity and good conscience to permit Jobanputra to retain the 50% of the profits and fees she made during the time she and Kim agreed to form FP Capital through the term of FP Capital."  *Id.* at 16, ¶ 18.  Besides a conclusory allegation that "Jobanputra accepted these services performed by Kim," Kim makes no factual allegations as to how Kim's work on FP Capital conferred any benefit to Jobanputra.  *See id.* at 16, ¶ 21.  To the contrary, Kim expressly alleges that Jobanputra was working on her own, *independent* venture capital firm to invest in initial coin offerings and cryptocurrencies.  *Id.* at 14–15, ¶¶ 16–17.  He makes no allegations that Jobanputra in any way benefited from Kim's hired counsel, administrators, or auditors, nor the documents or strategies he prepared, nor that she approached any of the same investors with whom Kim had met for FP Capital.  Rather, his allegations suggest merely that Jobanputra worked by herself when Kim expected her to be working with him.  But such allegations are insufficient to state a claim for either unjust enrichment or quantum meruit, and Kim's claims must therefore be dismissed.

### C.  Leave to Amend

The Court will, however, grant Kim leave to amend the counterclaims.  Courts are instructed to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Motions to amend are ultimately within the discretion of the district

court judge, *Foman v. Davis*, 371 U.S. 178, 182 (1962), who may deny leave to amend for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (citation omitted); *see also Metcalf v. TransPerfect Translations Int'l, Inc.*, No. 19-cv10104 (ER), 2023 U.S. Dist. LEXIS 54340, at *10 (S.D.N.Y. Mar. 29, 2023) ("The party opposing the motion to amend bears the burden of proving the claim's futility."). This is a permissive standard since the Federal Rules "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits" of the case. *Conley v. Gibson*, 355 U.S. 41, 48 (1957). Moreover, the Second Circuit has counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015)).

Because this is the Court's first opportunity to highlight the precise defects of Kim's pleading, and it is not yet apparent that another opportunity to amend would be futile, the Court will permit him to replead the dismissed claims.

### IV.  CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED. The motion to quash the subpoenas is DENIED as moot without prejudice, and the parties are directed to meet and confer regarding the scope of the subpoenas in light of this decision.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 43 and 60.

It is SO ORDERED.

Dated:   August 21, 2023
         New York, New York

                                                    _____
                                                    EDGARDO RAMOS, U.S.D.J.