UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JALAK JOBANPUTRA,

                            Plaintiff,

        – *against* –

YOON KIM *and* MOCHI CAPITAL,
LLC,

                            Defendants.

**OPINION & ORDER**

21-cv-7071 (ER)

R̲AMOS̲, D.J.:

## I.    BACKGOROUND

Jalak Jobanputra brought claims against Yoon Kim and Mochi Capital, LLC ("Mochi," and collectively, "Defendants") for allegedly withholding her share of the profits resulting from the parties' 2017 joint cryptocurrency investment venture.[1]  Doc. 1. Kim counterclaimed for breach of fiduciary duty, unjust enrichment, and quantum meruit resulting from Jobanputra's creation of a new investment fund that included outside investors.  Doc. 32.  The Court ultimately dismissed all of Kim's counterclaims.  Doc. 71, 82.

Before the Court are Defendants' motion for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Doc. 90, and Jobanputra's cross motion for summary judgment, Doc. 93.  For the reasons set forth below, Jobanputra's motion for summary judgment is GRANTED, and Defendants' motion for summary judgment is DENIED.

### A.  Statement of Facts

The following facts are undisputed except where otherwise noted.

---

[1] Defendants do not make a distinction between Kim and Mochi in their memorandum in support of their motion for summary judgment.  *See generally* Doc. 91.

*1. Initial Business Venture*

Jobanputra and Kim met through mutual friends in 2005.  Doc. 95 ¶ 2.

Jobanputra founded the venture capital fund Future\Perfect Ventures ("FPV") in 2014 to

invest in blockchain technology.  *Id.* ¶ 4.  Kim became an investor in FPV in 2016 and, in

2017, he invested $425,000 in Jobanputra's second fund, FVP II.  Doc. 99 ¶ 25; Doc. 103

¶ 5–6.  Jobanputra receives 20 percent of investments profits in both funds as incentive

allocation.  Doc. 99 ¶ 25.  In May 2017, Kim made plans to sell his apartment in Tribeca,

New York City, and expressed interest in using the proceeds from the sale to invest in

cryptocurrency.  Doc. 95 ¶ 7.  Jobanputra and Kim thereafter started discussing investing

in cryptocurrency together.  Doc. 91 at 10.  Specifically, they discussed that Jobanputra

would be responsible for identifying possible cryptocurrency investments, and Kim

would provide the capital for the investments they mutually agreed to make.  Doc. 103 ¶

11.  On June 12, 2017, Kim started Mochi, a single member LLC to use in connection

with his investments in cryptocurrency.  Doc. 97-1 at 15.

Jobanputra and the Defendants entered into an oral agreement in 2017 concerning

their proposed cryptocurrency investments.  On August 4, 2017, Jobanputra emailed Kim:

"I am fine with the structure we discussed in terms of incentive allocation."  Doc. 103 ¶

10.  Kim and Jobanputra "agreed to split any profits on a 20 ([Jobanputra]) / 80 (Kim)

basis subject to discussion about how to 'maximize profits' and to allocate profits on a

semi-annual or annual basis."  Doc. 94 at 6.

On August 10, 2017, Kim sent Jobanputra an email titled, "[m]y thoughts (and

very open to discussions)," in which he explained that Jobanputra would bear "no capital

risk" and that they would "share all funding, proceeds, and liquidity transaction data…"

Doc. 97-13 at 2.  In other words, Kim assured Jobanputra that she would not be

personally responsible for any of the financial losses of the invested capital if the venture

either underperformed or failed, but that there nonetheless would be full transparency and

information sharing between the parties.

2

The parties invested in two cryptocurrencies—Polkadot ("DOT") and Blockstack ("STX").[2]  Doc. 95 ¶ 9.  On August 23, 2017, Kim emailed Jobanputra saying that he thought a $100,000 investment in DOT was appropriate:  "It's a relatively larger chunk of our initial capital but given our mutual long term goal and the quality, I think this justifies it," and asked for updates on the timing of a DOT sale.  Doc. 97-18 at 2.  The following day, Jobanputra responded that the DOT project was "still figuring out allocations on PolkaDot [sic]" but assured Kim that "I am staying on top of it."  *Id.*

On September 24, 2017, Jobanputra notified Kim that there would be an early sale of DOT tokens to "private round participants" the following week.  Doc. 103 ¶ 17.  Kim and Jobanputra agreed to use Mochi as the vehicle to invest in DOT.  *Id.* ¶ 18.  On September 25, 2017, Kim told Jobanputra that he was designating her as a Director at Mochi to confirm her affiliation to the joint investments.[3]  Doc. 96 ¶ 14.  That same day, Kim and Jobanputra discussed drafting an agreement formalizing the terms of their cryptocurrency venture.

In his deposition, Kim admitted that he promised to designate Jobanputra as a Director of Mochi "to get this deal done."  Doc. 97-1 at 26.

Also on September 25, 2017, Kim sent Jobanputra the following email:

> This letter is to confirm an agreement between Jalak Jobanputra ("Jalak") and Yoon Kim ("Yoon") to collaborate on identifying, researching, and executing investments in Initial Coin Offerings ("ICOs") and cryptocurrencies like Bitcoin and Ethereum dated September 1, 2017.  Jalak will source, provide insights and bring access to the investments.  Yoon will provide the initial capital for the such [sic] investments.  Once an investment is made after collaboration on due diligence and mutual agreement to initiate the investment, then the profits from the investment is to be shared between Jalak (with 20% share) and Yoon (80% share).  Profit calculation and allocation will be done on a semi-annual or annual

---

[2] Defendants assert that Jobanputra and Kim never entered into a final agreement regarding the cryptocurrency investments.  Doc. 103 ¶ 11.

[3] Kim notes that this agreement was to show the Web 3 Foundation ("Web 3"), the company managing the Polkadot token sales, that she was connected to Kim's investment.  Doc. 103 ¶¶ 19, 25.

> basis, pursuant to future discussion between Jalak and Yoon to maximize profits, and encompassing all ongoing investments made under this agreement.[4]

Doc. 96 ¶ 14; *see also* Doc. 97-23 at 2.

At approximately the same time, Kim and Jobanputra agreed to increase the DOT investment from $100,000 to $150,000 due to the strength of DOT. Doc. 103 ¶ 24. On September 29, 2017, Jobanputra forwarded Kim an email from Web 3 explaining how to acquire DOTs, enclosing a so-called Simple Agreement for Tokens ("SAFT"), and providing instructions on how to submit a payment. *Id.* ¶ 25. That same day, Kim signed the SAFT on behalf of Mochi. *Id.* Web 3 countersigned the SAFT on October 11, 2027, and Kim—via Mochi—submitted a payment of $150,000 to Web 3 and, in return, received 5,320.101 DOTs. *Id.* ¶¶ 26–27.

Towards the end of October 2017, Jobanputra identified a potential investment in STX through an ICO. Doc. 103 ¶ 28. Kim was initially hesitant about investing in STX, but Jobanputra had a personal connection with the founder of Blockstack and convinced Kim it was a good investment. *Id.* ¶¶ 28–29. Jobanputra reached out to the Blockstack founder for instructions on how to invest in the STX ICO. *Id.* ¶¶ 27–28. Jobanputra subsequently emailed Kim the registration link for the ICO, saying: "No presale here but we should participate." *Id.* ¶ 29. Kim responded, "[y]ou mentioned this before. I'm on it." *Id.* In November 2017, Kim purchased 208,333 STX tokens for $25,000. *Id.* ¶ 30. At times, Kim emailed Jobanputra referring to the DOT and STX purchases as "our" investment and "our purchase. Doc. 97-32 at 2 ("Just emailed my cut at the agreement, Also, we should chat about how [sic] the size of our investment in Polkadot ICO…"); Doc. 97-31 at 2 (referring to STX as "our" purchase).

---

[4] Kim points out that the subject line of the email is: "a first cut at the agreement, let me know what you think or changes you like!" Doc. 103 ¶ 21. Kim also notes that the email included potential deal points that the parties had not yet "discussed in depth". *Id.*

On April 20, 2019, Kim emailed Jobanputra suggesting increasing the value of the STX investment.  Doc. 103 ¶ 33.

On July 16, 2019, Polkadot announced that everyone who purchased DOTs in 2017 would receive an equivalent share of its experimental network, Kusama ("KSM"), another cryptocurrency, at no additional cost.  Doc. 103 ¶ 34.  In accordance with the initial DOT investment, Polkadot deposited 5,320.101 KSMs into the Mochi wallet.  *Id.* ¶ 35.

### 2. Subsequent Business Venture

In early 2019, Kim suggested to Jobanputra that they start a hedge fund specializing in cryptocurrencies.[5]  Doc. 103 ¶ 36.  Kim "hoped to tap into the investors in [Jobanputra's] FVP funds and to benefit from the association with [Jobanputra's] FVP 'franchise' because she had a 'better known name' in the blockchain and venture community."  *Id.* (citing Doc. 97-1 at 35).  Jobanputra agreed to explore the idea, and the two started discussing a potential hedge fund.  Doc. 103 ¶ 36.

On April 12, 2019, Jobanputra emailed Kim, "I think the fact that we did Polka Dot [sic] + Blockstack together is a good thing to include in materials.  What would the potential return be on [Blockstack] for us?"  Doc. 97-34 at 2.  Kim responded later that day, "I did mention both of them in the strategy overview as our ICO, ie non-public investment examples."  *Id.*

In February 2020, Kim prepared an investor presentation that included Jobanputra and Kim as the "leadership team" of FP Capital, a cryptocurrency assets venture capital fund created to expand their joint business and specifically mentioned DOT and STX as "Prior Token Investments."  Doc. 103 ¶ 37.  Later that month, the parties decided not to move forward with FP Capital.[6]  Doc. 103 ¶ 39.

---

[5] Defendants contest that Kim first approached Jobanputra about this deal in 2019 and instead note that they had been discussing this deal since 2017.

[6] The reason the parties did not move forward with FP Capital is a source of dispute between Jobanputra and the Defendants.

*3. Alleged Breach of Contract*

On August 18, 2020, DOTs became transferrable.  *See* Doc. 97-36.  Jobanputra

called Kim to discuss selling the DOTs, but Kim did not pick up her calls.  Doc. 103 ¶ 41.

On August 21, 2020, the DOT network changed the denomination of its tokens

such that the original 5,320.101 DOTs issued to the Mochi wallet were denominated to

532,010.10 DOTs.  *See* Doc. 97-38; Doc. 94 at 13.  Additionally, by staking[7] the DOTs

and KSMs purchased in 2017, Kim received "staking rewards" in the form of additional

DOTs and KSMs.  *See* Doc. 97-1 at 38, 59 (admitting to receiving additional DOTs "in

kind" from staking), *id.* at 60 (testifying that he began to stake DOTs on about July 14,

2020), *id.* at 61 (testifying that he began staking KSMs on August 21, 2020), *id.* at 58

(admitting increase in KSMs in his cryptocurrency holdings was due in part to staking);

Doc. 97-49 (December 31, 2020 email from Staked with subject line "December 2020

Staking Report" showing that Kim's staking rewards for DOTs as of December 2020

were 6,385.8).

Jobanputra emailed Kim on August 29, 2020 to let him know that his phone

number was out of service and to ask how he was and if he was following DOTs.  Doc.

96 ¶ 22; Doc. 97-37 at 2.  Kim forwarded Jobanputra's August 29 email to his friend,

Kenny Oh, that same day, saying:  "Hahahaha.  Still going to ignore her."  Doc. 97 ¶ 41;

Doc. 97-40 at 2.

Jobanputra emailed Kim again on September 2, 2020 asking, "Are you ok??"

Doc. 97-41 at 2.  A week later, on September 9, 2020, she emailed him again:  "Firstly,

making sure you are OK," and asking to discuss "a strategy around DOT . . . Hope all is

OK!"  Doc. 96 ¶ 23; Doc. 97-39 at 2.  The next day, Jobanputra again wrote:  "Hope all is

OK," and again asking "to connect re DOT."  Doc. 97-42 at 2.  Kim did not respond to

any of these emails.  Doc. 96 ¶ 25; Doc. 103 ¶ 46.

---

[7] "'Staking' is a process that allows participants to earn rewards, here in the form of additional tokens, by locking their cryptocurrency tokens in their wallets for a period of time."  Doc. 98 at n. 2.

STX tokens became fully transferrable in January 2021.  Doc. 103 ¶ 55.

Kim emailed his friend Kenney Oh on February 17, 2021, "I am back in business so to speak because of the DOT investment, hahaha . . . Jalak screwing me over w the fund launch and legal costs turned out to be a great thing after all."  Doc. 97-46 at 3.  In that same email, Kim also told Kenney Oh that he had staked DOTs and KSMs since July 2020.  *Id.*

After not hearing from Kim, Jobanputra retained counsel in February 2021.  Doc. 96 ¶ 25.  On March 5, 2021, Jobanputra's attorney sent Kim a written demand letter, notifying him that Jobanputra considered his failure to respond to her a breach of their contract and asking for 20% of the DOTs and KSMs that she had identified for the parties' investment or their cash value.  *Id.*; Doc. 97-44.

To date, Kim has not transferred tokens nor allocated any profits to Jobanputra.  Doc. 103 ¶ 52.  The value of these tokens has grown significantly since the initial investments were made.  *Id.* ¶ 53.

**B.  Procedural History**

Jobanputra commenced this action against Kim and Mochi on August 20, 2021, asserting claims of breach of contract, unjust enrichment, quantum meruit, and breach of fiduciary duty arising from Kim's alleged failure to transfer Jobanputra's share of the investment proceeds.  Doc. 1.  Kim and Mochi moved to dismiss all of Jobanputra's claims on December 3, 2021.  Doc. 19.

On September 28, 2022, the Court dismissed the breach of fiduciary duty claim, as well as the breach of contract claim to the extent it was based on the breach of a joint venture agreement, but it otherwise denied Defendants' motion.  Doc. 29.  Although the Court granted Jobanputra's request for leave to amend her complaint, *id.* at 18–19, she did not so amend.

Kim and Mochi answered the complaint on October 28, 2022, and Kim counterclaimed for breach of fiduciary duty.  Doc. 32.  He amended the counterclaims on

January 26, 2023, adding additional counterclaims for unjust enrichment and quantum meruit. Doc. 37. Jobanputra moved to dismiss the amended counterclaims on March 23, 2023. Doc. 60. The Court granted Jobanputra's motion to dismiss each of Kim's counterclaims on August 21, 2023. Doc. 71. The Court held that Kim had not sufficiently pleaded that FP Capital was a joint venture, because while the counterclaim established the parties' intent to be joint venturers, Kim failed to allege that each party had joint management control or that they agreed to share losses from FP Capital. *Id.* at 6–12.

The Court granted Kim's request for leave to amend his counterclaims. Doc. 71 at 13–14. On September 8, 2023, Kim amended his counterclaims a second time, asserting only breach of fiduciary duty. Doc. 74. To address the element of joint management control, he added an allegation that "[the parties] jointly controlled and managed the joint venture[,]" that both "were required to—and did—consult with each other before making important decisions regarding the venture[,]" including hiring management, and that both were "required to agree on any investments actually made by FP Capital … consistent with written representations they both made to potential investors." *Id.* ¶¶ 9–10. Jobanputra filed a motion to dismiss on September 22, 2023, arguing that the amended counterclaims was not sufficient to cure the prior pleading deficiencies, and that Kim still failed to sufficiently allege breach and damages. Doc. 75. On October 16, 2023, the Court granted the motion to dismiss the breach of fiduciary duty claim with prejudice. Doc. 82.

On November 19, 2024, the parties jointly wrote to the Court seeking a briefing schedule for motions for summary judgment. Doc. 87. On December 19, 2024, Defendants filed their motion, seeking summary judgment on Jobanputra's breach of contract claims as well as her unjust enrichment and quantum meruit claims. Doc. 90. That same day, Jobanputra filed her cross motion, seeking summary judgment on her breach of contract claim against Kim, and, in the alternative, on her quasi-contract claims. Doc. 93.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed.R.Civ.P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F. 3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F. 3d 612, 618 (2d Cir. 1998).  Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322–23).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F. 3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F. 3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F. 3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March*

*of Dimes Birth Defects Foundation*, 51 F. 3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

The same legal standard applies when analyzing cross-motions for summary judgment. *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y.2004) (quoting *Aviall, Inc. v. Ryder System*, Inc., 913 F. Supp. 826, 828 (S.D.N.Y.1996)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entertainment, Inc.*, 249 F. 3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Board of Education*, 667 F. 2d 305, 314 (2d Cir. 1981)). The Court is not required to grant summary judgment in favor of either moving party. *See id.* (citing *Heublein, Inc. v. United States*, 996 F. 2d 1455, 1461 (2d Cir. 1993)).

## III.    DISCUSSION

### A.  Breach of Contract Claim

*1.  No Triable Issues Exist as to Whether a Contract Exists*

The primary questions presented by the cross-motions for summary judgment are whether the parties entered into a valid, enforceable contract, and consequently, whether the contract was breached.

"[I]n order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F. 3d 279, 288–89 (2d Cir. 2019) (quoting *Express Industries & Terminal Corp. v. N.Y. Department of Transp*ortation, 93 N.Y.2d 584, 589 (N.Y. 1999). "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F. 3d 793, 799 (2d Cir. 2011). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous."

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F. 3d 153, 157 (2d Cir. 2000). Whether the language of a contract is clear or ambiguous "is a question of law to be decided by the court." *Id.* at 158. Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (quoting *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F. 3d 109, 1094 (2d Cir. 1993)).

Summary judgment may be granted only where "the movant shows that there is no genuine dispute as to any material fact," such that the Court may enter judgment as a matter of law." Fed. R. Civ. P. 56(a). Such is the case here. Defendants allege that the parties never agreed to the key material term of the contract—namely, how the parties would split the investment proceeds (or the unsold tokens)—and that therefore, there was never a meeting of the minds, which a requirement to enter into a valid, enforceable contract. Doc. 91 at 18–19.

Jobanputra argues that "[p]arties' emails, other communications, and course of conduct can give rise to an enforceable contract even where the terms of the contract were not reduced to a fully executed writing." Doc. 94 at 16. Specifically, Jobanputra points to the September 25, 2017 email, where the parties discussed their respective responsibilities, the 20/80 profit split, and profit calculation. Doc. 103 ¶ 21. Jobanputra asserted that she sent Kim the September 25, 2017 email "to confirm [their] agreement" and called him the next day to confirm again. *Id.* ¶¶ 21–22. Jobanputra argues that her allegations have been consistent: she and Kim entered into an agreement in which she would identify cryptocurrency investments for which Kim would provide the capital and they would split the profits 20/80, with Kim keeping 80 percent. Doc. 105 at 6. Jobanputra adds that, based on the above communications, she began identifying the cryptocurrency investments, and Kim provided the liquid capital to purchase the tokens she identified. Doc. 94 at 17–18. She concludes that "[b]y their express words and

deeds, [she] and Kim indisputably demonstrated mutual assent and an intent to be bound, thereby creating a valid, enforceable contract." *Id.* at 18.

Defendants assert that Jobanputra's filings describe "three different contracts that Kim has allegedly breached." Doc. 101 at 16. According to Defendants, Jobanputra has inconsistently alleged terms of the contract as follows: (1) the so-called "Demand Letter Contract," dated March 5, 2021, which Defendants assert relies solely on Kim's August 10, 2017 email, Doc. 101 at 16, and "establishes all of the material terms of the contract save for the final commission amount agreed upon of 20%", Doc. 103 ¶ 121; (2) the "Complaint Contract," which allegedly includes the "20% Token Transfer Term," *id.* ¶¶ 126–27; and (3) the "Discovery Agreement," memorialized in a September 25, 2017 email from Kim, which covers ICOs and liquid cryptocurrencies like Bitcoin and Ethereum, *id.* ¶ 91 and requires that Jobanputra and Kim discuss the sale of tokens once they become transferable. Doc. 94 at 12.

Defendants also argue that the September 25, 2017 email, which Jobanputra refers to as the breached contract, is "merely a draft proposal," as he was "try[ing] to pull together discussions he had been having with Jalak and to propose new thoughts about a potential arrangement." Doc. 101 at 18–19. Specifically, Defendants note that the subject line of the September 25 email is "a first cut at the agreement, let me know what you think or changes you like," Doc. 103 ¶ 21, which means that the email was merely a draft. This argument is unavailing. Calling a piece of writing a draft does not make it less of an agreement if all other circumstances point to the existence of a contract. *Kolchins v. Evolution Markets, Inc.*, 128 A.D.3d 47, 60 (2015), *aff'd*, 31 N.Y.3d 100 (2018) ("The mere fact that defendant often referred to the writing in progress as a 'draft' is not dispositive here where other correspondence indicates that the parties may have had a different understanding."). Lastly, Defendants note that the email did not include all the material terms, including tax liability and how they would calculate potential losses and uneven returns among the covered cryptocurrency investments, so the email

12

cannot itself be the contract.  Doc. 101 at 20.  This, too, is not dispositive.  *Kolchins*, 128
A.D.3d at 48 ("While some terms were omitted in the parties' exchanges, all the terms
contemplated by an agreement need not be fixed with complete and perfect certainty for a
contract to have legal efficacy.").

The last three breach of contract factors—adequate performance by the plaintiff,
breach by the defendant, and damages—also weigh in favor of Jobanputra.  *First*,
Jobanputra adequately performed, as evidenced by her identification of the two
cryptocurrencies in which Defendants invested.  *Second*, Defendants breached the
contract when Kim accepted her services and failed to compensate Jobanputra for those
services.  *Third*, Jobanputra was damaged because she has not received the tokens
themselves or their cash value.

Therefore, no disputes remain as to what the terms of the contract were.  Pursuant
to the above, the terms of the contract here are "wholly unambiguous."  *Compagnie
Financiere de CIC et de L'Union Europeenne*, 232 F.3d at 157.  Because the Court finds
that no genuine disputes of material fact remain as to this issue, Jobanputra's motion for
summary judgment as to the breach of contract claim is GRANTED and Defendants'
motion as to the same is DENIED.

### 2.  *Judicial Admission*

Defendants further argue that, in the Complaint, Jobanputra "repeatedly alleges
that a material term of the alleged Contract is the 20% Token Transfer Term," [8] and that
this term "is a judicial admission that binds Plaintiff throughout this action."  Doc. 91 at
21–22.  Defendants define the "20% Token Transfer Term" as an agreement that
Defendants would distribute 20 percent of the *tokens* initially purchased to Plaintiff once
they became transferrable, as opposed to their *cash value or realized profits*.  *See id.* at
20–23.  They argue that Jobanputra, in her Complaint, repeatedly alleged that she was

---

[8] The phrase "20% Token Transfer Term" was coined by Defendants and does not appear anywhere else in
the record.

entitled to 20 percent of the *tokens*. *Id.* at 22. They add that, therefore, Jobanputra cannot abandon or seek to controvert the 20% Token Transfer Term now that there is no admissible evidence that the parties ever agreed to the 20% Token Transfer Term. *Id.* at 20–23.

According to Defendants, Jobanputra, in her sworn deposition, admitted that the parties never agreed to the 20% Token Transfer Term. *Id.*; Doc. 103 ¶ 129. Specifically, Defendants point to the following exchange during Jobanputra's deposition:

> Q. Transferring 20 percent of the respective cryptocurrency investments, when did Mr. Kim agree to do that?
>
> A. He did not agree to doing it.
>
> Q. Okay. There was never an agreement between you two that he would do that; correct?
>
> A. That he would affirmatively do that, no, because I could not reach him.

Doc. 103 ¶ 129 (quoting Doc. 92 at 19).

Jobanputra responds Defendants mischaracterize the Complaint and that "these allegations assert a *legal* theory of breach, not material contract terms," and, consequently, they are not judicial admissions. Doc. 98 at 8 (emphasis in original); *id.* at 14–16. She also argues that the Complaint does not "intentional[ly], clear[ly] and unambiguous[ly]" allege a 20% Token Transfer Term as is required by judicial admissions.[9] *Id.* at 21–24.

Defendants' argument is unconvincing. A factual concession in a pleading is as judicial admission to which a plaintiff is bound. *Inn World Report, Inc. v. MB Financial Bank, NA*, No. 21-cv-2911, 2022 WL 17841529, at *3 n.3 (2d Cir. Dec. 20, 2022). "A party's statement interpreting a contract cannot be a judicial admission because it constitutes a legal conclusion rather than a factual admission." *In re Wansdown*

---

[9] Jobanputra alleges that Defendants breached the contract "by refusing to split profits, speak with [Jobanputra], *or* transfer tokens to her so that they could make her own decisions about when to sell and realize profits." Doc. 98 at 14 (emphasis added).

*Properties Corp. N.V.*, 620 B.R. 487, 499 (Bankr. S.D.N.Y. 2020) (citing *International Cards Co., Ltd. v. MasterCard International Inc.*, No. 13-cv-2576 (LGS), 2017 WL 1133425, at *5 (S.D.N.Y. Mar. 24, 2017) (a party's interpretation of a notice provision in a contract is "a legal argument rather than a factual statement" and therefore "is not a judicial admission that precludes [a party] from asserting the legally correct interpretation of the contract."), *aff'd,* 741 F. App'x 41 (2d Cir. 2018)).

As a preliminary matter, and as noted above, the Court notes that the phrase "20% Token Transfer Term" never appears in the Complaint, nor in Jobanputra's moving papers. The phrase was coined by Defendants and appears for the first time in Defendants' memorandum in support of their motion for summary judgment.

Secondly, and critically, while Defendants reference several paragraphs in the Complaint to bolster their arguments,[10] the Complaint also explicitly references that Jobanputra is entitled to the cash value of the tokens in lieu of the tokens themselves. Doc. 1 ¶ 24 ("The profits would be split with Jalak receiving 20% of each investment … Kim was entitled to retain the other 80% of the investment."); Doc. 1 ¶ 25 ("Jalak and Kim agreed that the profits, *i.e.*, cryptocurrency/proceeds/value from each joint venture transaction would be distributed once there was liquidity in the relevant cryptocurrency investment, that is, once the relevant cryptocurrency was transferrable. Once the cryptocurrency was transferrable, both Jalak and Kim could have realized profits either from sale of the cryptocurrency assets or by utilizing those assets on their respective networks, such as by deriving staking rewards.").

The Court therefore finds that the statements Defendants rely on in Jobanputra's Complaint fall short of the type of clear, unequivocal, and formal concessions that is

---

[10] *See* Doc. 1 ¶ 33 ("However, Kim has yet to transfer to Jalak her 20% of the 5,320.101 KSM, which would be 1,064 KSM."); Doc. 1 ¶ 37 ("Kim never transferred to Jalak her 20% of the DOTs, which given the redenomination, would amount to 106,402.02 DOTs."); Doc. 1 ¶ 39 ("Kim has never transferred to Jalak her 20% of the STX"); Doc. 1 ¶ 40 ("Since August 18, 2020, Jalak has repeatedly e-mailed and called Kim demanding transfer of the 20% of the KSMs, DOTs, and STX to which she is entitled under the terms of the Agreement.").

required of a binding judicial admission.  *See, e.g.*, *TR 39th Street Land Corp. v. Salsa Distribution USA, LLC*, No. 11-cv-7193 (DF), 2015 WL 1499173, at *5 (S.D.N.Y. Mar. 25, 2015) (finding that statement was not a judicial admission because it was not "unequivocal" and because other statements were to the contrary); *Diaz v. Reno*, No. 97-cv-6580 (MBM), 2000 WL 502852, at *3 (S.D.N.Y. Apr. 26, 2000) (citing authorities defining "judicial admission" as "distinct and formal admission" or "unequivocal admission" made by attorney).  In *International Cards Co., Ltd. v. MasterCard International Inc.*, the court held that, "even assuming MasterCard's current interpretation [of the contract] is inconsistent with a prior one, any prior interpretation is not a judicial admission" and MasterCard was not precluded "from asserting the legally correct interpretation of the contract" on summary judgment.  2017 WL 1133425, at *5. Here, too, the Court finds that while Jobanputra's Complaint contains allegations that "all profits [were] subject to a 20/80 split" as well as references to a transfer of 20 percent of the tokens, and, consequently, her statements are not judicial admissions.

As a result, Defendants' argument that the "20% Token Transfer Term" constitutes a judicial admission fails.[11]

**B.  Quasi-Contract Claims:  Unjust Enrichment and *Quantum Meruit***

Even if Jobanputra's motion for summary judgment as to the breach of contract claim had been denied, Jobanputra's motion for summary judgment on her quasi-contract claims would nevertheless be granted.

"Under New York law, *quantum meruit* and unjust enrichment claims are analyzed together as a single quasi-contract claim."  *National Utility Service, Inc. v. Tiffany & Co.*, No 07-cv-3345 (RJS), 2009 WL 755292, at *9 (S.D.N.Y. Mar. 20, 2009) (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d

---

[11] Consequently, Defendants' argument that, during discovery, Jobanputra "signaled that she has abandoned the Contract pled in the Complaint [the so-called 'Complaint Contract'] and now seeks to enforce a different, unpled agreement she formulated during discovery" is without merit.  Doc. 91 at 27–28.

168, 175 (2d Cir. 2005)); *see also Snyder v. Bronfman*, 921 N.E.2d 567, 569 (N.Y. 2009) ("Unjust enrichment and quantum meruit are, in this context, essentially identical claims, and both are claims under a contract implied … in law to pay reasonable compensation." (alteration in original) (internal quotation marks omitted)). "[W]here there is an enforceable written contract governing the particular subject matter, claims based on quasi-contract theories like unjust enrichment do not provide a distinct basis for recovery." *Vitrano v. State Farm Insurance Co.*, No. 08-cv-00103 (JGK), 2008 WL 2696156, at *3 (S.D.N.Y. July 8, 2008).

To recover in *quantum meruit* under New York law, "a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson Catskill*, 418 F.3d at 175 (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)). Similarly, to state a claim for unjust enrichment under New York law, a plaintiff must plead facts showing that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (citations and internal quotation marks omitted). Under either theory, the "essence" of the claim "is that one party has received money or a benefit at the expense of another." *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted).

Here, the court finds that Jobanputra performed a service in good faith, as evidenced by her identification of the two cryptocurrencies in which Defendants invested, that Kim accepted her services, and Jobanputra expected to be compensated for those services. Kim benefitted at Jobanputra's expense because she identified the DOTs and STXs in which Defendants invested and Kim, to date, has not provided her with any profits from those investments, the cash value of the tokens, or the tokens themselves. Doc. 94 at 27. Her email exchanges with Kim further establish that she expected to be

compensated for the services she provided.  Doc. 95 ¶¶ 10–32.  Defendants argue that Jobanputra failed to provide evidence that Defendants benefited *at her expense*.  Doc. 91 at 27.  However, in both oral and written discovery, Kim admitted that Jobanputra identified the DOT and STX investments and that he was unaware of these investment opportunities prior to Jobanputra bringing them to his attention.  Doc. 103 ¶ 32.  In other words, Kim benefitted from Jobanputra's services because she advised him to make investments Kim might not have otherwise made.  *Farash v. Sykes Datatronics, Inc.*, 59 N.Y.2d 500, 506 (1983) ("The quasi-contractual concept of benefit continues to be recognized by the rule that the defendant must have received the plaintiff's performance … 'Receipt,' however, is a legal concept rather than a description of physical fact.  If what the plaintiff has done is part of the agreed exchange, it is deemed to be 'received' by the defendant.") (internal citations and quotations omitted).  Kim therefore benefitted from Jobanputra's services.

The remaining point of contention is whether Jobanputra can establish a reasonable value for her services, and consequently, whether she was damaged.  *See Mid-Hudson Catskill*, 418 F.3d at 175.  Kim argues that Jobanputra has failed to offer evidence that she was damaged in quasi-contract because Jobanputra did not provide a value for her services and that, in any case, such calculation requires expert testimony, which Jobanputra did not provide.  Doc. 91 at 26.  That argument is unavailing. [12]  Reasonable value is often defined as "the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered," or "the amount for which the defendant could have obtained services under like circumstances."  *Vioni v. Providence Investment Management, LLC*, 750 F. App'x 29, 33 (2d Cir. 2018) (citing *Carlino v. Kaplan*, 139 F. Supp. 2d 563, 565 (S.D.N.Y. 2001)).

---

[12] As Jobanputra points out, courts in this district have "reject[ed]" the "argument that expert testimony is required by Federal Rule of Evidence 702 to determine th[e] [reasonable] value [of services]" in a *quantum meruit* claim.  *In re WorldCom, Inc.*, 382 B.R. 610, 630 (Bankr. S.D.N.Y. 2008), *aff'd* WL 1496378 (S.D.N.Y. Apr. 19, 2011).

Jobanputra asserts, and Defendants do not contest, that 20% was "very standard in the industry, which is why [she and Kim] chose that." Doc. 92-2 at 15; Doc. 98 at 28–29. Jobanputra further states that 20% is consistent with what she typically receives in other incentive allocations and with Kim's previous experience paying 20% of profits in connection with his investments in two other venture capital funds managed by Jobanputra. Doc. 98 at 28–29. Therefore, Jobanputra has succeeded in establishing the that the reasonable value for her services was 20 percent.

Lastly, equity and good conscience militate against permitting the Defendants to retain what Jobanputra is seeking to recover. *Farash*, 59 N.Y.2d at 506 ("Whether denominated 'acting in reliance' or 'restitution,' all concur that a promisee who partially performs … at a promisor's request should be allowed to recover the fair and reasonable value of the performance rendered, regardless of the enforceability of the original agreement."). Defendants' argument that "the parties had an extensive history of exchanging professional favors, including Kim providing countless hours of uncompensated work for [Jobanputra]; and that Kim had actually invested an additional $425,000 in [Jobanputra's] funds at the time of discussions of a possible arrangement" is unconvincing. Doc. 101 at 29. The fact that Kim and Jobanputra may have exchanged favors over the fifteen years they were friends does not take away from the fact that the cryptocurrency joint ventures described above carry connotations of a more formal agreement, not a mere favor. *Capitol Coal Corp. v. Commissioner of Internal Revenue*, 250 F.2d 361, 363 (2d Cir. 1957) (noting that "[f]riendship between [parties] who have been dealing with each other for many years is scarcely an abnormal situation" but it does not conclusively weigh in favor of finding that the parties intended to gift their goods or services).

*1. No Triable Issues Exist as to Whether Defendants Have Realized Any Profits from their Investments in DOT and KSM.*

Jobanputra has been damaged because she has not received the tokens themselves or their cash value. The fact that Defendants have not sold the DOT or KSM tokens and therefore have not realized any profits from those investments does not counter the finding that Jobanputra has not at all benefitted from those investments.

It is undisputed that Kim has not sold any DOTs or KSMs and therefore cannot distribute any profits. Doc. 103 at 23; *Deitrick v. Cibolo Capital Partners I, LLC*, No. 17-cv-4165 (ER), 2020 WL 508863, at *9 (S.D.N.Y. Jan. 30, 2020) ("Deitrick has not shown any evidence, other than a conclusory assertion that TG sold many guitars, that TG or Cibolo have received any profits from the deal to disgorge."). Jobanputra argues, and Defendants do not dispute, that Defendants earned "in kind" benefits from staking the original investments in the form of additional DOT, STX, and KSM tokens that Defendants have received. Doc. 98 at 27; *see also* Doc. 105 at 14. Additionally, while there are not any realized profits since these tokens have not been sold, Jobanputra is still entitled to the tokens themselves or their cash value. Doc. 94 at 27 ("to date, [Defendants] ha[ve] failed to provide her with any profits from those investments, nor has he provided [her] with the tokens or their cash value."). Consequently, Jobanputra's motion for summary judgment as to the quasi-contract claim involving the DOT and KSM investment is GRANTED and Defendants' motion for summary judgment as to the same is DENIED.

*2. No Triable Issues Exist as to Whether Defendants Have Realized Any Profits from the STX Investment*

On the other hand, Defendants have realized profits from the STX investments. Kim admitted that he had sold all of the STX tokens in June of 2021 for approximately $100,000. Doc. 103 ¶¶ 68, 119. Jobanputra argues that damages should be calculated based on the value of the tokens at the date of breach, March 5, 2021, when she sent Kim the demand letter notifying him that she considered his failure to respond to her a breach

20

of their contract.  Doc. 94 at 22.  "It is settled Second Circuit law that in a breach of
contract case, damages are calculated at the time of the breach."  *Boyce v. Soundview
Technology Group, Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) (citing *Lucente v. International
Business Machines Corp.,* 310 F.3d 243, 262–63 (2d Cir.2002)).  The STX tokens in
Kim's wallet were worth $253,249.595 on March 5, 2021 when Jobanputra sent Kim the
demand letter.

Therefore, assuming the reasonable value for Jobanputra's services was 20
percent, she is entitled to 20 percent of $253,249.595 minus the $25,000 that Kim
initially invested in STX.  Doc. 94 at 27 (Jobanputra "is entitled to restitution in the
amount of 20% of the STX sale minus the $25,000 that Kim initially invested in STX");
Doc. 99 ¶ 53 ("208,333 STX were worth $253,249.595").  Accordingly, Jobanputra's
motion for summary judgment as to the quasi-contract claim involving STX investment is
GRANTED and Defendants' motion for summary judgment as to the same is DENIED.

## IV.    CONCLUSION

For the reasons set forth above, Jobanputra's motion for summary judgment is
GRANTED, and Defendants' motion for summary judgment is DENIED.  The Clerk of
Court is respectfully directed to enter judgment in favor of Jobanputra and terminate the
motions, Docs. 90 and 93.


It is SO ORDERED.


Dated:    September 18, 2025
          New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.